STATE ex rel. WM. G. DeBERRY v. JOHN A. NICHOLSON.

*Elections, Powers of Canvassing Board and Courts—Election Laws, how far Directory merely—Registration of Voters— Oath of Elector, The Code, § 2681—Oaths, how Administered, Presumption as to, The Code, § 3310—Constitution, Art. 6, § 2—Officers de facto; acts of valid—The Code, § 2687—Province of Judge and Jury.*

1. The election returns from a polling precinct to the Board of Canvassers failed to show for what *office* the votes cast for certain candidates were given, whereupon the canvassing board refused to consider the returns from that precinct: *Held*, that upon a *quo warranto* the Superior Court could look behind the precinct returns to ascertain for what office the votes were cast, especially when it was admitted in the pleadings that the relator and the defendant were competing candidates for the office in dispute, and were voted for as such at the various polling places in the county.

2. *Semble*, that the Board of County Canvassers can look behind the precinct returns and inspect the ballots cast at a precinct, or resort to the personal knowledge of one of its members, to ascertain for what office certain candidates were voted for.

3. Statutes prescribing rules for conducting popular elections are designed chiefly for the purpose of affording an opportunity for the free and fair exercise of the right to vote. Such rules are directory, not jurisdictional or imperative. Only the forms which affect the merits are essential to the validity of an election or the registration of an elector.

4. An irregularity in the conduct of an election, which does not deprive a voter of his rights, or admit a disqualified person to vote, which casts no uncertainty on the result, and which was not caused by the agency of one seeking to derive a benefit from the result of the election, will be overlooked when the only question is which vote was the greatest. The same principles are applicable to the rules regulating the registration of electors.

5. The oath to be taken by electors, prescribed by *The Code*, § 2681, in substance and legal effect, fully meets the requirements of Art. 6, § 2, of the Constitution of the State.

102—30

6. Where it appears that the registrar administered the prescribed oath to electors, but that he did not swear them on the Bible, it will be inferred, in the absence of direct proof to the contrary, that the oath was taken with uplifted hand, as specified in *The Code*, § 3310, and was accepted as a valid mode of administering it, by both the registrar and the elector. Administering the oath in such manner is sufficient to meet the requirements of the election law.

7. The vote given at a polling place must not be rejected, because of a disregard of those directions contained in the Constitution or statutes (except as to the time and place of holding the election) the non-observance of which amount to mere irregularity. The same principle governs the registration of electors.

8. The registration of an elector, who is qualified to vote, must be accepted as the act of a public officer, and entitles the elector to cast his vote.

9. (By Smith, C. J. Even if no oath is administered to the elector or the registrar, the registration must be accepted as the act of a public officer, and the elector allowed to vote, and this, so far as it concerns the elector and the person for whom he votes, just as other acts of the officer, acting *de facto* under color of office, and so recognized by the public, cannot be questioned by inquiring into his rightful title thereto in their relations to others.)

10. The principles governing the acts of officers *de facto*, but not *de jure*, as laid down in *Norfleet* v. *Staton*, extend to the acts of those charged with the duty of conducting a popular election.

11. A failure to keep the registration books open on the Saturday before the election, during the whole of the prescribed time, does not vitiate the election when no one was denied the right of examining the books.

12. That one of the officers appointed to conduct an election was absent a short time from the polls, during which time no vote was cast and the ballot-boxes were not tampered with, nor was any opportunity afforded for tampering with them, does not vitiate the election.

13. Where votes were handed to the judges of election rolled up and secured by an elastic band, and the judges distributed the votes among the boxes, *The Code*, § 2687, was not violated, and such votes were properly received and counted.

14. Where the jury asked for instructions from the Judge, as to whether they had the right to pass upon the legality of certain votes, and the Judge told them no, and *advised* the jury that they should take and act upon the law as laid down by him: *Held*, that in this, not as a mandate, but as advice, there was no error.

CIVIL ACTION, tried before Merrimon, J., at February Term, 1889, of RICHMOND Superior Court.

Defendant appealed.

The relator of the plaintiff and the defendant were, at the election held in Richmond County, in the month of November last, competing candidates for the office of Register of Deeds for said county, and were voted for, as such, at the various precincts therein. The returns of the several elections were duly made to the Board of County Canvassers, one of which, that coming from Wolf Pit Township, while giving the votes cast respectively for the two candidates, omitted the name of the office for which the votes were cast, as were the others, except the vote for electors, which did conform to·the requirements of the statute.

The Board of County Canvassers proceeded to open, canvass and determine the result of the election, rejecting the returns from Wolf Pit precinct, for the imperfection mentioned, and declared the defendant to be elected, he having received, of the votes cast at the other places of voting in the county, 1,740 votes, and the relator 1,628 votes. There were cast at the rejected precinct, for the relator 265, and for the defendant 105 votes, which, if counted, would have reversed the result, and given to the relator a majority of 48 votes. The exhibit of the rejected returns shows that none of the offices to fill which the election was then held are designated, it containing only the names of the several persons voted for, and the number of votes given to each, except the electors of President and Vice·President of the United States.

The sole issue submitted to the jury, and responded to in the affirmative, is in these words: " Was the relator duly elected to the office of Register of Deeds of Richmond County at an election held on the 6th day of November, 1888, and is he entitled to be inducted into said office?"

Upon this verdict, it was declared and adjudged that the defendant is not and the relator is rightfully entitled to said

office, and to be admitted into its possession on complying with the conditions prescribed by law.

His Honor charged the jury that if they believed, from the evidence, that at the election in Wolf Pit Township, on the 6th of November, 1888, three hundred and seventy votes were cast for the candidates for the office of Register of Deeds for Richmond County, and of that number the relator W. G. DeBerry received two hundred and sixty-five, and the defendant John A. Nicholson one hundred and five, they should answer the issue in the affirmative.

The jury retired, and while they were out sent to the Judge the following question to be answered by him: " Is the legality of the votes a question for the jury?" His Honor called the jury in the box, and replied: " No; it is not." His Honor then repeated his charge, and instructed the jury to retire and make up their verdict. The jury thereupon responded to the issue, " Yes," without leaving the box, and the defendant excepted.

*Mr. J. A. Lockhart,* for the plaintiff.
*Mr. P. D. Walker,* for the defendant.

Smith, C. J. The legality of the action of the canvassing board, in refusing to count, for the reason alleged, the votes cast in the township mentioned, in ascertaining the general result, is alone drawn in controversy in the action, and, to support that action, the appellant superadds and assigns numerous alleged irregularities and departures from the statutory regulations in the conduct of the election at that voting place. These, enumerated in the answer and urged in argument upon the hearing before us, are now to be considered, and their sufficiency to affect the result, to be determined.

The defect in the return itself, as a ground for its entire exclusion from the count:

The statute does require the canvassing board, in passing upon the returns conveyed to it by a designated judge of election, acting at the place of voting, to " make abstracts stating the number of legal ballots cast in each precinct for *each office*, the name of each person voted for, and the number of votes given to *each person for each different office ;*" and this presupposes the return to furnish the information, without which the abstract could not be prepared. But, as the board judicially determines the result, is this omission irremediable and fatal to the reception of the vote, or may it be supplied or deduced from attending facts?

When, from the possession of the other regular and unobjectionable returns, it is seen what persons were voted for, and to fill what offices, may not the knowledge, thus obtained, be used to supply the defect, in the absence of any suggestion that the electors voted for any others to fill the office ? or may not the canvassing board resort to the ballots, or the personal knowledge of the member of the body who brings the return, in proof of the fact ? It would be strange if so technical and rigid a rule of action should be sufficient to stifle so large an expression of the popular will, and defeat its operation in the choice of a public county officer. But, however this may be in the action of the canvassing board, whose functions are largely ministerial, it is certainly competent in the Court to which the wronged party appeals, in suing out the writ of *quo warranto*, to look behind the return, to see for what offices the votes were given to the contesting candidates, and an inspection of the ballots themselves would very conclusively settle the inquiry, if it became necessary, the ballots being identified without further proof. In the present case the fact is not disputed, for the complaint avers that the parties to the suit " were the opposing and competing candidates *for the office of Register of Deeds* for said county, and *were voted for as such at the various polling places, precincts and townships in said county;*" and this is

admitted in the answer, with the sole qualification that the ballots cast in the disputed, township were not legal.

The reason given for the rejection of the entire vote cast at this precinct, failing to invalidate the election then held, and to warrant the retention of the office into which the defendant has been inducted, his counsel assails the vote on other grounds, alleging that:

1. The proper oath (and in some instances none was taken) was not administered to the electors before the registration of their names.

2. The registrar of voters was not legally appointed.

3. The failure to keep open for inspection the registration books from 9 A. M. until 5 P. M., on Saturday preceding the election.

4. The rolled-up votes were improperly received; and other deviations from the statutory regulations as found in vol. 2 of *The Code*, ch. 16, §§ 2668, and following.

It is not pretended that persons incompetent to vote, for want of the necessary qualifications of an elector, have in fact been registered, but that the prerequisite conditions for such registration have not been observed, and their votes ought not to have been counted.

In *Southerland* v. *Goldsboro*, 96 N. C., 49, it is declared that registration, as prescribed in the Constitution, is an essential prerequisite to the exercise of the right of suffrage, as much as the possession of the personal qualifications without which no one is entitled to be registered, and that when such registration is made the registration furnishes *prima facie* evidence of the right to vote, made as it is under officers of the law charged with that duty. So that, here, in the registration, we have evidence of the personal qualifications of the voter, his right to be registered and his actual registration, without any testimony to the contrary ; and thus the sole question is as to the effect of the omissions to comply strictly with the law in the particulars pointed out, or others of a similar kind, upon the validity of the election held in the

township in which they occurred. We propose to consider these alleged inequalities in a group, because the answer to them is common and alike applicable to each.

In *Perry* v. *Whitaker,* 71 N. C., 477, an election to ascertain the will of the electors as representing the body of which they form a part, in reference to a prohibition of the sale of spirituous liquors in the township, was declared void "for the reason that a large number of the citizens of the city were not allowed to vote, for the reason that they were not registered and no opportunity was offered them to vote."

In *Swain* v. *McRae,* 80 N. C., 111, it is declared that the failure to have a new registration when ordered, because the order was made within thirty days of the time required by law for opening the books of registration, did not excuse the action of the canvassing board in excluding that precinct vote from the count made to ascertain the general result.

The true principle which should govern in cases of popular elections is thus concisely and clearly laid down in *People* v. *Cook,* 8 N. Y., 67, and reported as a leading case, with a valuable note, in Brightly's Leading Cases on Elections, page 438:

" The neglect of the inspectors or clerks to take an oath would *not have vitiated the election.* It might have subjected *those officers to an indictment if the neglect was willful.*"

So Breese, J., in a carefully considered case in Illinois, thus more fully states the rule: " The rules prescribed by law for conducting an election are designed chiefly to afford an opportunity for the free and fair exercise of the elective franchise, and to ascertain with certainty the result. Such rules are *directory merely, not jurisdictional or imperative.* If an irregularity, of which complaint is made, be shown to have *deprived no voter of his right,* nor *admitted a disqualified person to vote,* if it cast no uncertainty upon the result, and had not been occasioned by the agency of a party seeking to derive a benefit from it, it may well be overlooked in a case of this kind, when the only question is, which vote was

the greatest. The forms which must be observed in order to render the election valid are *those* which affect the merits." *Platt* v. *People,* 29 Ill., 72.

We deem this a sound and just exposition of the law, and as furnishing a reasonable guide in solving controversies growing out of popular elections, which are becoming so numerous.

Judge McCrary, in his work on elections, speaking of irregularities in conducting them, which deviate from the provisions and directions of the statute, pushes the proposition further, and says that, "if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time, or in a particular manner, and does *not declare that this performance is essential to the validity* of the election, then they will be regarded as *mandatory if they do,* and *directory if they do not, affect the merits of the election."* Sections 187 to 190 inclusive.

It is urged with much emphasis in the argument for the defendant, that the form of the oath itself and the manner in which it was administered to the voter, depart from the imperative demands of the Constitution and the positive provisions of the statute, to a degree that vitiates the registration of so large a number, that are thus rendered illegal voters, that, if excluded, would change the result of the election, and give it to the relator. There are estimated to be about 400 votes which are exposed to this condemnation.

The registrar testifies that he did enter some names on the registry at first without swearing the persons, but does not undertake to state the number, nor does it appear for whom these voted, if they voted at all. But he says he did not swear those to whom he did administer the oath upon the Bible, without stating in what manner it was done; and that the form of the oath used was that prescribed in the statute (*The Code,* § 26̌1). It is in these words: " I, ____, do solemnly swear (or affirm) that I will support the Constitution

of the United States and the Constitution of the State of North Carolina; that I have been a resident of the State of North Carolina for twelve months, and of the county of ___ for ninety days; that I am a duly qualified elector, and that I have not registered for this election at any other precinct, and that I am an actual and *bona fide* resident of ____ township (or precinct). So help me, God."

Inasmuch as 400 or more voters were registered upon taking the oath in this form, and the total number of ballots cast were but 370, it must be inferred that all who did vote, voted upon such oath. The contention is, that the rejection of the whole ballot operates only as an exclusion of those cast by persons alleged to have been illegally registered.

If the proposition of an illegal and incapacitating registration be conceded, the conclusion drawn follows as a consequence, and the entire ballot cast at the precinct must be discarded. But it ought to appear, to warrant this, that none of those voting were regularly and properly sworn; for it is no reason to deprive a qualified voter of his vote that another has been registered who ought not to have been, and has no right to vote. In such case the list should undergo expurgation, and those of the latter class—not qualified—stricken from the number given to the candidate for whom, when ascertained, the illegal votes were cast, for it is equally the right of the candidate receiving lawful votes to have them counted, as for the opposing candidate to have those that are not lawful rejected from the count.

But assuming the alleged taint to permeate the whole registry, is it such as to vitiate and annul the entire, or, indeed, any part of the vote, cast at the contested precinct?

The oath taken is that prescribed by the statute in the very words, and differs from that directed to be taken by sec. 2, Art. VI, of the Constitution, only in the omission of the words "and laws of the United States," following the word "Constitution," and "laws of North Carolina not incon-

sistent therewith," following the same word in reference to the State. In substance and legal effect the constitutional requirement is fully met in the oath as taken, for, as the laws derive their force from the Constitution, which gives authority for their enactment, it is plain that an obligation undertaken and a promise made "to support and maintain" the respective constitutions, extends to, and embraces, all legislative action which is authorized by, and made pusuant to, them, and the violation of a valid enactment is a violation of the Constitution that imparts its sanction to the enactment.

The next objection is directed to the mode of administering the oath.

It must be inferred, in the absence of any direct evidence upon the point, that the oath was taken with uplifted hands, as specified in § 3310 of *The Code*, and was accepted, as a valid mode of administering it, by both the registrar and the elector. We regard this objection as equally untenable with the other.

The oath was administered in the form authorized by law (§ 3310) for persons who have conscientious scruples about swearing upon the "Holy Evangelist," as specified in the preceding section, in providing that such may be sworn with the right hand uplifted. Whether, if an inquiry had been instituted, the presence of such scruples would have been found to exist or not, it is quite sufficient that an oath was administered in a form sanctioned by the statute, and taken with a full recognition of its binding force upon the conscience and of the responsibilities which are incurred by taking it.

Aside from these considerations, we are of the opinion that a disregard of those directions found in the law, fundamental or statutory (except as to the time and place of holding the election), relating to the manner of conducting it, designated as irregularities, not affecting the result as a fair ex-

pression of the popular will, does not warrant a rejection of the vote given at a polling place. The same principle must govern the registering of the electors. If none are incompetent to vote who are put on the list, the registration must be accepted as the act of a public officer, and entitles the elector to the casting of his vote; and this, in my opinion, speaking for myself, even if there had been no oath in fact administered, so far as it concerns the elector and the person to whom he gives his ballot, just as other acts of the officer acting *de facto*, under color of office, and so recognized by the public, cannot he questioned by inquiring into his rightful title thereto in their relations to others. His acts, and the exercise of his functions, from the highest considerations of public policy, as affecting the interests of third persons, must be accepted as rightful and valid. This includes and disposes alike of the objection to the registrar's appointment and to his alleged non-observance of the statutory directions in placing the electors' names upon the registry. It is needful only to refer in this connection to *Norfleet* v. *Staton*, 73 N. C., 546, where the effect of acts of persons acting *de facto*, as such, and not *de jure*, is fully discussed and authorities referred to.

In this case a Judge elected to fill a vacancy in the term of office, in pursuance of an act of the General Assembly, declared to be repugnant to the Constitution, which itself provided a different mode of supplying the vacancy, made an appointment of Clerk, while so acting, the validity of which was called in question, and sustained upon an appeal to this Court. Yet, in this case, an appointee, deriving his title under the Constitution, was asserting his claims to the office, which were afterwards made good, and he inducted into possession.

The extension of the principle to those charged with the duty of conducting a popular election, is fully supported by adjudications. McCrary Elec., sec. 216.

The fact that the registration book was not kept open during the whole prescribed period, on the Saturday before the election, cannot be allowed to render the election void, when it was kept open for inspection up to 2 P. M., and no one was denied the opportunity of examining it or sought it afterwards. This does not vitiate the election.

Quite as little force is found in the objection that one of the officers absented himself for a short time for dinner, as it affirmatively appears, from the uncontradicted testimony, that no one voted during the interval, and tampering with the ballot-boxes did not take place nor was opportunity afforded for it.

Again, there were many votes, more than a hundred, as a witness testifies, handed in rolled up, secured by an elastic band, which were given for the relator, and these were distributed among the boxes by the judges. These were, in our opinion, not obnoxious to the requirements of sec. 2687, and were properly received and counted. *Deloatch* v. *Rogers*, 86 N. C., 357.

What has been said is an answer to the complaint made of the refusal of the Court to give any of the fifteen instructions asked, which are based upon the imperfections and irregularities already considered and passed upon, and sustains the instructions given, which is confined to an inquiry as to the state of the vote as actually given at the Wolf Pit Township place of voting, about which, indeed, there was no controversy.

A further error is assigned in the response to an inquiry from the jury, as to their right to pass upon the legality of the votes. The negative is the only answer that could be given, as it was a pure question of law, about which it was the duty of the Judge to instruct, and them to be guided thereby.

It is true the verdict involves an inquiry into the lawfulness of the votes, as well as their number, but it was emi-

nently proper to advise the jury that they should accept the law as declared by the Court, and apply it to the facts as they find them to be, for in this division and exercise of functions by the Court and jury, concurrently leading to the verdict, can the law be properly administered in the courts and enforced before juries. The response of the Judge is, in substance, that the jury should take and act upon the law as laid down by him.

In this, not as a mandate, but as advice, there is no error. The judgment must therefore be affirmed, and it is so ordered.

No error.                                            Affirmed.