JOHN SPRUNT HILL v. B. S. SKINNER, MAYOR, AND THE BOARD OF ALDERMEN OF THE CITY OF DURHAM.

(Filed 22 September, 1915.)

1. **Municipal Corporations—Elections—Bond Issues—Statutory Notice—Interpretation of Statutes.**

The statutory requirement that notice be given of the opening and closing of places of registration, and that the registration be kept open and accessible for a specified time, are regarded as essentials by the courts in passing upon the validity of bonds to be issued by a municipality for the purpose of constructing a waterworks plant; but where it appears that full notice of the election was given, including a notice therein that there would be a new registration, and that the books were afterwards opened for a time actually sufficient to afford all an opportunity to register, though short of the legal period, and it further appears that the election has been hotly contested by both sides, each of which thoroughly canvassed the voting precincts and extensively advertised the election and registration in the local newspapers and otherwise, resulting in an unusually large vote cast at the election, and there has been given to all a fair and full opportunity to vote; that there has been no fraud, and the election was in all respects free from taint or suspicion, and that no material change in the result of the election could otherwise have been produced if the statute had been strictly complied with, the law, looking to the substance and not so. much to the form, will not set aside the expression of the popular will for the issue of bonds, as expressed at the election, and enjoin the execution and sale of the bonds thus approved, because of the failure to keep the registration books open for the full time required by the statute.

2. **Same—Appeal and Error—Injunction—Findings of Facts—Supreme Court.**

It appearing from the record on appeal, in this action to restrain a municipality from issuing bonds in order to acquire a waterworks plant, that the result of an election held for the purpose of voting on the question would not be affected by the failure of the officers to give certain full notice of places of registration, and that the election was fair, offering full opportunity to the people for voting, the order of the lower court, continuing a previous order restraining the issuance of the bonds, is reversed, and the injunction dissolved, though the lower court failed to find the facts stated, this Court exercising its right to do so.

ALLEN, J., dissenting; HOKE, J., concurring in the dissenting opinion.

CIVIL ACTION, heard before *O. H. Allen, J.,* at Oxford, on 27 July, 1915, upon an application for an injunction. Upon the granting of the injunction defendants appealed.

Plaintiffs sought to enjoin the defendants, as mayor and aldermen of the city of Durham, from issuing bonds of said city in the sum of $500,000, and from levying any tax for the payment of the principal or interest thereof, for the purpose of providing a municipally owned system of waterworks under Private Laws 1913, ch. 336, or any other supposed authority of law. An election was held in said city, at which the question of issuing the said bonds was submitted to the people, in accordance with an order of defendants at a regular meeting of the municipal council on 14 February, 1914, requiring that an election for said purpose should be held on 21 April, 1914, and at the same time a new registration for the said election was ordered. It is not disputed that due and formal notice of the election was given, but the plaintiff attacks the validity of the election upon two grounds: (1) That thirty days notice of the time for opening and closing the registration books and of the places of registration was not given. (2) That the registration books were not kept open and accessible to the voters of the city for twenty days, as required by law. There were 1,322 voters who registered for the election and 988 votes were cast, of which 826 were in favor of the bond issue and 162 against it. It appears from the affidavit of George W. Woodward, clerk of the board of aldermen, who examined the records of the city for the information he gave, that only twice have so many votes been cast at such an election, and both of those elections occurred a year or more before the one in question, viz.: at the school bond election, 2 May, 1915, the total vote was 1,070; at the election on the commission form of government, 21 April, 1913, it was 919; but at the election of aldermen, 7 May, 1913, it was only 448, and at the same kind of election, 5 May, 1915, it was 572, and at the elections in the city since May, 1905, it has varied, at times, considerably, between 448 as the lowest to 1,070 as the highest vote cast. The qualified voters at the water bond election, 21 April, 1914, numbered 1,197, or 125 short of the registered vote, and at the new charter election, 17 March, 1915, they numbered 1,448. There was evidence before the judge who heard the case that two active and opposing leaders in the water bond election of April, 1915, and in the canvass preceding it, which was warmly and zealously conducted, had, some time before the day of the election, obtained from the tax books in the hands of the deputy sheriff of the county, with his assistance, two accurate lists of all the qualified voters of the city, which embraced those who had paid their taxes and those exempt from taxation, and one of those lists showed the number of qualified voters to be 1,392. Upon investigation, Mr. Brogden, who favored the bond issue and who got one of the lists, found that

it included the names of some persons who had died and of others who had removed their residences from Durham, and of others who were not entitled to vote for other reasons. It was afterwards agreed between Mr. Brogden and the other gentlemen who opposed the bond issue, by way of estimate only, that the qualified voters of the city did not exceed 1,300 in number. The campaign for and against the bonds, it appears from the proof, was carried on with unusual activity and unabated ardor and zeal, each side endeavoring to poll its full vote, and searching constantly for those who had become of age since the time for listing taxes had expired and for any persons exempt from taxation and whose names, therefore, did not appear on the tax books. Meetings were held by one if not both factions to find the voters and bring them to the polls, and no pains seems to have been spared in the effort to obtain a full vote. The rivalry was great, if not intense, and by the efforts of the two bodies, who were working for different results, but for a large vote, it seems that every available voter was not only notified of the registration and election, but was urged to qualify himself and cast his vote at the election. We cannot read the evidence without being convinced that every voter had actual, as well as formal, notice of the election, and actual notice of the registration and a full opportunity to cast his vote for or against the issue of bonds, had he so desired. There is ample evidence that the question was thoroughly advertised in the two daily newspapers, with urgent appeals to the voters to register and vote, owing to the great importance of the result to the city, and this was done continuously and long before the day of election. There is other evidence which, taken by itself, shows that 826 voters represented a majority of the electorate, and this may safely be taken as the fact.

There is a class of evidence tending to show, and we find the fact so to be, that from 17 February, 1915, to 21 April, 1915, both dates inclusive, the election was thoroughly though informally advertised, and many articles were published which called public attention to it, and the passage of the measure was warmly advocated. These articles appeared from day to day in the *Durham Sun* and the *Morning Herald,* newspapers published daily in the city, and discussed the merits of the question "pro and con." The issue of 17 February, 1915, announced the decision of the board of aldermen to order the election on the third Tuesday of April, which was the 21st day of that month, and also stated that a new registration had been ordered for the election. We insert this extract from the complaint: "Notice of said new registration was published for the first time in the *Durham Daily Sun* on 20 March, 1914, and the first time in the *Morning Herald* on 21 March, 1914; that the registration books for said election were opened on Friday, 3 April, 1914, and closed on Saturday, 11 April, 1914, at 9 o'clock p. m., and

that the thirty days notice of said new registration by advertisement in some newspaper was not given as required."

The notice of the registration was ordered to be given on 18 March, 1915, and was published as above stated, but as a part of the election notice, and in it the places of registration, names of registrars and judges of election, and the first day of registration, 3 April, 1915, were clearly stated. The notice further set forth that the books for registration would be kept open after 9 o'clock p. m. on each day, Sunday excepted, and except on Saturdays, wthen they would be closed at 9 o'clock p. m. The books were finally closed on Saturday, 11 April, 1915, at 9 o'clock p. m.

The learned judge, after hearing the evidence and·argument of counsel, but without finding any facts, held that the injunction prayed for should be granted, and a judgment to that effect was entered, whereupon the defendants appealed.

*R. P. Read* and *E. J. Hill* for *plaintiff*.
*J. L. Morehead, W. B. Guthrie, P. C. Graham, Victor S. Bryant* for *defendants*.

WALKER, J., after stating the case: The law does not provide for notices of an election and the registration of voters, a preliminary thereto, as mere idle ceremonies, to be given or not, as may suit the whims or convenience of those who may have the calling and conduct of the election and its machinery in charge, but it is intended to be a serious and important part of the procedure under which the election is called and held, and is not to be neglected or omitted, under any circumstances, by those to whom has been intrusted the duty of complying with the law. It is always to be considered as an essential to a regular election and not as a mere nonessential which will have no weight with the courts in deciding as to the validity of an election, for the contrary is true. But the object of notice, both of the election and the registration, is to afford an opportunity to every qualified voter to express his opinion on the question submitted to the people for their approval or disapproval, and if the notice is not given as required by the law, and it further appears that, by reason of the omission, this fair opportunity has not been given to the voters, the election will be declared as void, if thereby the result would be materially affected.

While, so far as the officers are concerned who are charged with the duty of giving the notice, the requirement as to notice is imperative, yet it will be regarded, otherwise, as directory, if the result would not be changed by a departure from the provisions of the statute. The law looks more to the substance than to the form, and if it appears that a clear majority of the qualified voters have cast their votes in favor

of the proposition submitted to them, and that there has been a fair and full opportunity for all to vote, and that there has been no fraud, and the election is in all respects free from taint of any sort, so that no well-founded suspicion can be cast upon it, it would be idle to say that this free and untrammeled expression of the popular will should be disregarded and set aside. If a set of men do that, in the same way and with the same effect, which they could only have done if there had been notice to do it, and there would be no essential difference in the result with or without the notice, the law attaches less importance to the giving of notice under such circumstances, and will not invalidate the result. Our own decisions, and those in other jurisdictions, though there are a few to the contrary, strongly support this view of the law. The principle is nowhere better stated than in McCrary on Elections (3 Ed.), sec. 190:

"If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statutes must so hold, whether the particular act in question goes to the merits or affects the result of the election or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the Legislature. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the merits of the election." This statement of the law was approved by us in _S. v. Spires,_ 152 N. C., 4. See, also, _Deberry v. Nicholson,_ 102 N. C., 465; _Yountz v. Comrs.,_ 151 N. C., 582; _Deloatch v. Rogers,_ 86 N. C., 357; _Hendersonville v. Jordan,_ 150 N. C., 35; _R. R. v. Comrs.,_ 116 N. C., 563; _Claybrook v. Comrs.,_ 117 N. C., 458; _Bethea v. Dillon,_ 74 S. E., 983; _Newsom v. Earnhart,_ 86 N. C., 391; _Swain v. McRae,_ 80 N. C., 111.

It was said in _Rodwell v. Rowland,_ 137 N. C., 617, that a strict compliance with the formality of notice in the case of an election is not always required, as the authority to hold the same is derived from the law and not from the notice, the latter being intended merely to apprise the voters of the time and place appointed for the election, and the registration as well, and that actual notice will sometimes take the place of formal notice or supply the defect or informality of notice, and will be sufficient to sustain the election, if there has been fair and full opportunity to vote, and the result has not been materially changed by any failure to give notice at all, or the want of notice for the full time required. "There is no presumption against the validity of an election; the presumption, if any at all, is the other way." And it was said sub-

stantially· in *Wood v. Oxford,* 97 N. C., 227, and *Riggsbee v. Durham,* 99 N. C., 341, that the formal and official declaration of the result is *prima facie* evidence of its correctness, and the burden is upon him who asserts the contrary, and that the crucial question is, What was the true result, and did a majority of the qualified voters of the town (Durham and Oxford) vote for the schools in the one case or the issue of the railroad bonds in the other? And if this were the case, the alleged irregularity would not defeat or avoid the election. This Court said in *Quinn v. Lattimore,* 120 N. C., 432 : "The object of the law—a fair and full expression of the will of the qualified voters—must be kept in mind; and if this has been obtained, and no fraud appears, we will not look for more irregularities to defeat his will." And in *Hampton v. Waldrop,* 104 N. C., 453, where there was an irregularity in the conduct of the registration, it was held that it would not vitiate the election if everything was fairly done and a fair opportunity to vote given, and no one voted whose name did not appear on the registration book and no one voted who was not entitled to vote and no one who was entitled to vote was excluded.

The case of *Swain v. McRae,* 80 N. C., 111, is quite pertinent. It appeared there that a registration was ordered, but not had for the reason that the order was made within less than thirty days of the time required by the statute for opening the books, though there were forty-five days between the date of the order and the day of the election, and the court held that the result should stand as if there had been a formal compliance with the law in all other respects, because the informality would not be regarded as material if there had been a sufficient opportunity to register and vote and the statute was substantially, though not strictly, complied with. See *Tyson v. Salisbury,* 151 N. C., 469.

We held in *Yountz v. Comrs., supra:* "When it has been found as a fact by the lower court that every qualified voter has had a fair and ample opportunity to register, an election declaring for a special school tax would not be held invalid by reason of the fact that the registrar left the district for a part of two days out of the twenty days required for registration. And irregularity in the conduct of an election which does not deprive· a voter of his rights or admit a disqualified voter to vote, which casts no uncertainty on the result, and which was not caused by the agency of one seeking to derive a benefit from the result of the election, will be overlooked when the only question is which vote was greatest. The same principles are applicable to the rules regulating the registration of electors."

As to the necessity for a strict compliance with the law in respect to registration, it is said by a careful text-writer: "The registration laws are chiefly for the purpose of allowing a fair exercise of the elective

franchise, and a strict compliance with all their provisions is not, as a general rule, necessary to the validity of the election, provided the result of the election expresses the will of the majority of the qualified electors. Where a strict compliance with the terms of the registry law by the election officers is not essential to preserve the purity of the election, the votes of electors should not be rejected because of, nor will the validity of the election be affected by, irregularities, unless they are such as to affect the result." 10 A. and E. Enc. (2 ed.), p. 618, citing, among other cases, *Deberry v. Nicholson, supra,* and *Newsom v. Earnhart, supra.* And as to lack of notice, he says: "In the case of special elections, when the law does not fix the time and place of holding the same, but they are to be fixed by some authority, failure to give notice or issue a proclamation of the election will render it a nullity unless the people have actual knowledge and attend, so that the result is not affected. If it appears that the people generally had actual knowledge of a special election, so that the result would not have been different if proper notice had been given, failure to give such notice does not vitiate the election." 10 A. and E. Enc. (2 Ed.), 626. And again: "The failure to give notice for the full time before an election required by statute will not render the election invalid, if there was sufficient notice thereof and a full vote." 10 A. and E. Enc. (2 Ed.), 630.

These principles in the law of elections have passed under the consideration of many courts in other jurisdictions, and the clear, if not decided, weight of authority favors the view we have taken. *S. v. Carroll,* 17 R. I., 591; *Ellis v. Karl,* 7 Neb., 381; *Dishon v. Smith,* 10 Iowa, 212; *S. v. School District,* 13 Neb., 466; *S. v. Lansing,* 46 *ibid.,* 514; *People v. Avery,* 102 Mich., 572; *S. v. Doherty,* 16 Wash., 382; *Demarie v. Johnson,* 50 N. E., 376; *Young v. Comrs.,* 14 Bush (Ky.), 161; *Woodward v. Fruitvale Sanitary Dist.,* 99 Cal., 554; *Seymour v. Tacoma,* 6 Wash., 427; *Athlone case,* Bar. and Am. Elec. Cases, 115.

A substantial compliance with the requirement is sufficient. 10 A. and E. Enc., 632; *Ch. R. R. Co. v. Pinckney,* 74 Ill., 277; *People v. Sisson,* 98 Ill., 335; *West v. Whitaker,* 37 Iowa, 598; 10 A. and E. Enc., 766; *Datz v. Cleveland,* 7 L. R. A., 431; *Adsit v. Secretary,* 11 *ibid.,* 534; *Moyer v. Vandevanter,* 29 *ibid.,* 670, and *S. v. Lansing,* 35 L. R. A., 124.

In *Demarie v. Johnson,* 50 N. E., 376, it was held that a strict compliance was not necessary, and that a failure to comply with the provisions for giving notice did not render an election void, where it did not appear that the irregularity prevented such a number of electors from voting as would change the result. And in *Ellis v. Karl, supra,* the Court decided that where the result of the election would not have been different if proper notice had been given, the election would not be set aside at the suit of persons who had participated in it, as plaintiff in this case had done.

The ultimate conclusion from the authorities is thus stated in 10 A. and E. Enc. (2 Ed.), at pp. 755, 767: The general principles to be drawn from the authorities are, that honest mistakes or mere omissions on the part of the election officers, or irregularities in directory matters, even though gross, if not fraudulent, will not avoid an election, unless they affect the result, or at least render it uncertain. But if the irregularities are so great that the election is not conducted in accordance with law, either in form or substance, and there are matters of substance that render the result uncertain, or where they are fraudulent and the result is made doubtful thereby, the returns should be set aside.

But in *Perry v. Whitaker,* 71 N. C., 475, there is a strong intimation of the Court that an election held in the manner of this one should not be disturbed. *Justice Reade* there said: "In our case, no registration books were opened at all. This might not have worked any wrong, if every person otherwise qualified had been allowed to vote without regard to registration." If that be so, we do not see why an election held with registration books, and where there was fair opportunity to register and vote, and there is no fraud or suppression of votes or exclusion of proper votes, should not be considered as valid and binding upon the city and as giving authority to issue the bonds.

The case of *Briggs v. Raleigh,* 166 N. C., 149, 153, is, perhaps, more nearly analogous to the case at bar than any other. *Justice Brown* there said: "It is further contended that fifteen days notice of the new registration was not given. Yet it appears from the findings of the court that the electors of the city of Raleigh had actual knowledge of the registration, and that a very large majority of the electors did register and vote. Notice of the election and registration was published in the *Raleigh Times* and in the *News and Observer* for thirty days; and the court further finds that no citizen of Raleigh was denied the privilege of registering, but every qualified voter in the said city had ample opportunity to register, and that a very large majority of the newly qualified electors did register." The court below found no facts, but we are permitted to find them, and, as they appear to us, this election was more regularly conducted from its inception to the close of the polls and the declaration of the result than was the one in *Briggs' case.* If the voters of Durham did not acquire actual knowledge of the time of registration and election after so much agitation of the question, daily advertising, and a strenuous campaign by able and active factional leaders, a formal notice for the time required by the law would not have been apt to impart it. In that case (*Briggs v. Raleigh*) there was a failure to give the requisite notice of registration, and with respect to an objection based upon this fact, the Court, after using the foregoing language, quotes with full approval what was said about a similar objection in *Deberry v. Nicholson,*

*supra,* namely: "Statutes prescribing rules for conducting popular elections are designed chiefly for the purpose of affording an opportunity for the free and fair exercise of the right to vote. Such rules are directory, not jurisdictional or imperative. Only the forms which affect the merits are essential to the validity of an election or the registration of an elector"; and adds these significant words: "An irregularity in the conduct of an election which does not deprive a voter of his rights or admit a disqualified person to vote, which casts no uncertainty on the result, and which was not caused by the agency of one seeking to derive a benefit from the result of the election will be overlooked when the only question is which vote was greatest. The same principles are applicable to the rules regulating the registration of electors." And then, quoting from McCrary on Elections, secs. 187 to 190, inclusive, the proposition is laid down: "If, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that this performance is essential to the validity of the elections, then they will be regarded as mandatory if they do, and directory if they do not, affect the merits of the election."

Let us now apply more directly to the facts, as they appear in this record, the rule of law thus formulated. It is quite manifest that no qualified voter was denied, or deprived of, the right or opportunity to register and vote in this election. The vote actually cast was the second largest vote ever polled in a city election and certainly up to that date, and the registration list appears to have been the second largest, or at least the third, ever compiled for an election. There is no suggestion that any person, designated by name or otherwise, was deprived of the chance to register and vote. The election was in every respect fairly and honestly conducted. Two parties seem to have been arrayed against each other, and earnestly and with searching activity and zeal gathered in the voters from every precinct, scouring all quarters within the boundaries of the city, so that no one would be left out. The rivalry between them, though apparently quite friendly, was none the less decidedly energetic, and the contest for votes was warm in the beginning and grew in intensity as the campaign progressed. It is not likely that any voter was overlooked or lacked opportunity, or *importunity,* to qualify himself and cast his vote. If any such there were, we find no evidence of the fact in this record. We, therefore, take it that the vote cast at the election represented a clear majority of the qualified voters of this city, and that any irregularity in regard to notice of registration did not materially affect the result, which would, in fact, have been the same had full notice been given. It is true that there was a new charter election a year or so afterwards at which the qualified voters numbered 1,448, and a party primary in April, 1915, for the nomination of a mayor and board

of aldermen, when there were 2,400 registered, but these matters are too remote and intangible, and involved too much in conjecture, and without proper and adequate explanation as to the cause of the increase, to overturn an election when it is perfectly evident that the people were fairly and fully heard upon this vital question in the management of their municipal affairs. If those lists had been purged of any illegal registrations, and consideration given to the additions to the lists on account of voters who had, since April, 1914, become qualified by arrival at full age or otherwise, we could better determine what weight they should have in the estimate. There was an easier way of ascertaining if any person had failed to register and vote because the notice was not given for the full time, and in the absence of this kind of proof we would hesitate long before accepting the other as sufficient to overcome the conviction as to the true facts produced by the evidence as to the substantial regularity of the election and the reliability of the result.

It is suggested that the eight days allowed for registration were not sufficient; but where is the evidence of it in the record? The case shows that there was a fair, full, and free election of which the people of Durham had notice for the full period of thirty days prescribed by the law, and in that notice, and for the same length of time, they were also notified that there would be a new registration of voters, and by some sort of inadvertence, which not unusually happens, though it should not, the officers in charge of the election kept the books open for only eight days. The evidence is really conclusive, when properly analyzed, that every man who was entitled to register and vote did so, and that the result would not have been different if the full time of twenty days had been allowed. It is not contended, as we understand, that a failure to keep the books open for the full time would necessarily vitiate the election, for such a contention would be in direct conflict with our former decisions, and this being so, how much less than the full time would invalidate the result? Where will we draw the line? The safest way is to follow the principle heretofore declared, and reiterated, that the test is whether the deviation from the provisions of the law have materially affected the result or rendered it uncertain. What *Justice Merrimon* said in *Smith v. Wilmington,* 98 N. C., 349, was a general dissertation upon the necessity of a compliance with the law by the election officers, and in that case the Court does not even intimate that noncompliance will render the election void, unless it has essentially affected the result by excluding persons qualified to register and vote. The same justice said, at the very next term of this Court, in *Riggsbee v. Durham,* 99 N. C., 349, 350, where irregularities were said to have occurred: "These allegations, in a case like this, are too general and indefinite. The plaintiff should have alleged specifically and particularly the ground of com-

plaint against the validity or sufficiency of the election. If he intended to say that qualified voters were denied the right to vote, he should have named them and stated the number of them." The justice then goes on to say that "If the irregularities suggested by plaintiffs did in fact exist, they could not render void or defeat the election"; the question, at last, being, "What was the true result? Did a majority of the qualified voters of Durham vote for schools? This was the material inquiry to be considered and determined *de novo,* and finally, by the court." And to the same effect is *R. R. v. Comrs.,* 116 N. C., 563, 568, where the Court uses this strong and significant language: "We think the object of all elections is to ascertain, fairly and truthfully, the will of the people—the qualified voters. That registration, notice of elections, poll-holders, judges, etc., are all parts of the machinery provided by the law to aid in attaining the main object—the will of the voters, and should not be used to defeat the object which they were intended to aid. This being so, it is held that a substantial compliance with the provisions of the statute under which the election is held is sufficient." *Chief Justice Smith* said in *Smith v. Wilmington, supra,* at p. 354: "All have had an opportunity to register and thus secure the right to vote on the pending proposal, and if they failed to do so it is their own fault, and must be regarded as an acquiescence in the result."

There was not even an attempt made to point out a single individual who desired to vote and failed to do so because of the irregularity in the registration. On the contrary, it is perfectly apparent that there was none such, and that the registration and the vote cast at this election were almost unprecedented in their volume. The vote at a party primary the year afterwards furnishes no tangible proof that should discredit this election. As *Justice Merrimon* said, the plaintiff should have named the voters who, if registered, would have changed the result. It will not do to make general charges. They must be specific and backed by proof to substantiate them.

The object of the law has been fully attained. The people of Durham have asked for the privilege of constructing a water plant as necessary to their health and comfort, and have expressed in unmistakable terms their willingness to pay for it by taxation, and we see no valid reason why the popular will, so emphatically pronounced, should not be heeded. This is not like a case where the people have not been heard upon the important questions of taxation, when we should see that their rights are thoroughly safeguarded, and exact a strict compliance with the law.

We must declare this election to be valid, or overrule *Briggs v. Raleigh, supra,* and a long line of decisions in this Court, and disregard the overwhelming weight of authority in other jurisdictions. Extracts taken from a general discussion of the question as to the duty of officers to

comply with the law should be read with the context, and, as thus considered, they are in perfect harmony with our view of this election. As said by *Justice Merrimon* in *Van Amringe v. Taylor,* 108 N. C., 198, the irregularities must affect "the substance."

We have not discussed the interesting question raised by counsel, as to which law applies to the registration and election, as we have assumed, for the sake of the argument only, that the longer notice was required— that is, twenty days before the opening of the books for the registration of voters. As to which law does apply, we do not decide.

The order and judgment of the court below is reversed and the injunction will be dissolved, it being declared that the city authorities of Durham have the power, confirmed by a vote of the people properly taken, to issue the bonds and to provide for the payment of the principal and interest thereof as the law directs.

Reversed.

ALLEN, J., dissenting: The authorities in this State go very far in sustaining elections when there is no evidence of fraud, and properly so, but it has not yet been held that an election is valid when a new registration has been ordered and no notice of the registration has been published, and when full opportunity has not been given to all electors to register.

As said by *Associate Justice Walker,* in the opinion of the Court, "The law does not provide for notices of an election and the registration of voters, a preliminary thereto, as mere idle ceremonies, to be given or not as may suit the whims or convenience of those who have the calling and conduct of the election and its machinery in charge, but it is intended to be a serious and important part of the procedure under which the election is called and held, and is not to be neglected or omitted, under any circumstances, by those to whom has been intrusted the duty of complying with the law. It has always to be considered as an essential to a regular election, and not as a mere nonessential which will have no weight with the courts as to the validity of an election, for the contrary is true."

Speaking to the same point, and discussing the necessity of complying with the law as to registration, *Chief Justice Merrimon* said in *Smith v. Wilmington,* 98 N. C., 349: "To render it effectual—to make it serve the purpose of the law—it must be made by the proper officers, in the way and manner and at the times prescribed by law. The statutory regulations in such respects are not simply directory; they are in their *substance mandatory* as well; they do not simply imply discretion in those authorities charged with the execution of them, and, moreover, to allow the exercise of such discretion in respect to a matter essential, affecting the rights of individuals and the public of great moment,

might—would, no doubt, oftentimes—lead to private and public wrong, and serious confusion"; and again, in *Van Amringe v. Taylor,* 108 N. C., 198: "The ascertainment of the popular will or desire of the electors under the mere semblance of an election unauthorized by law is wholly without legal force or effect, because such election has no legal sanction. In settled, well regulated government the voice of the electors must be expressed and ascertained in an orderly way prescribed by law. It is this that gives order, certainty, integrity of character, dignity, direction, and authority of government to the expression of the popular will. An election without the sanction of the law expresses simply the voice of disorder, confusion, and revolution, however honestly expressed. Government cannot take notice of such voice until it shall in some lawful way take on the quality and character of lawful authority. This is essential to the integrity and authority of government. An essential element of a valid election is that it shall be held by lawful authority, substantially as prescribed by law. It is not sufficient that it be conducted honestly; it must as well have legal sanction. The statutory provisions and regulations in respect to public elections in this State must be observed and prevail, certainly in their substance. Otherwise, the election will be void, and so treated. Therefore, the contention that if the election in question was simply conducted fairly and honestly it was valid, is unfounded."

These decisions are not in conflict with the North Carolina cases commented on in the opinion of the Court, and all may be reconciled upon the ground that while the courts will not set aside elections because of slight deviations from statutory requirements, which have not affected the result, the directions of the statute must be *substantially* complied with or the election will have no legal effect; and if this is the law, I do not think a notice of a new registration published for fifteen days is a substantial compliance with a statute requiring it to be published thirty days, or that keeping the registration books open for eight days is a substantial compliance with a statute requiring twenty days; and that is the case before us.

The importance of compelling obedience to the restrictions imposed by the General Assembly is growing each year. The luxuries of one age become the necessities of the next, and no one can foresee what may be included in the class of expenses called necessaries within the near future. The tendency towards large bond issues for public improvements is also increasing, and the bond issue in this case amounts to one-half million of dollars. Only a few years ago it was held by this Court that debts created for sewerage, for waterworks, and for electric lights were not for necessary expenses, and that they must be approved by the people at the polls; but these decisions have been reversed, and now the gov-

erning authorities of a city may issue bonds in large amounts for these purposes without consulting the people who have to pay them.

The only safeguard left is that, although the debt is for necessaries, the General Assembly may require an election to be held, and may prescribe the rules and regulations for conducting it; and I do not think it wise to destroy or minimize this protection.

A different question might be presented if the bonds had been issued and were in the hands of innocent holders, but no harm can come when, as in this case, no rights have accrued, in requiring the question of issuing the bonds to be again submitted to the people at an election held according to law.

If eight days is a substantial compliance with a statute requiring twenty, where shall we stop? Will it be held that five days, or three days, or no days at all are sufficient? Has not the elector who is opposed to a bond issue the right to rely upon the law and to refuse to participate in an election illegally held?

HOKE, J., concurs in the dissenting opinion.