THE CHESTER & LENOIR NARROW GAUGE RAILROAD COMPANY and others *v.* THE COMMISSIONERS OF CALDWELL COUNTY.

SEC. 7 of ART. VII, of the Constitution of the State, prohibits any county, city, town or other municipal corporation from contracting any debt, &c., without the affirmative consent of a majority of the people of the county, who are qualified to vote.

And the Act of 1869–'70, Chap. 9, being an attempt to evade the restriction which the Constitution has put on counties, &c., to contract debts, is unconstitutionl and void.

(*Reiger* v. *Commissioners of Beaufort*, 79 N. C. Rep. 319, cited and approved; *Cloud* v. *Wilson*, at this term, distinguished from this.)

MANDAMUS, tried before *Mitchell, J.*, at Chambers, at January Term, 1875, CALDWELL Superior Court.

The plaintiff, the Chester and Lenoir Narrow Gauge Railroad Company, brought an action against the defendants, for a mandamus, to compel them to subscribe for certain stock in

the Company of plaintiff. The material facts in the case are as follows: The Carolina Narrow Gauge Railroad, was incorporated on the 8th day of February, 1872, by an act of the General Assembly, and immediately thereafter duly organized as a corporation.

By an Act of the General Assembly of South Carolina ratified February 26th, 1873, the Chester and Lenoir Narrow Gauge Railroad Company, was duly incorporated, and by a provision of that Act authorized to consolidate, with the Carolina Narrow Gauge Railroad Company. By an act of the General Assembly of North Carolina, ratified January 22d, 1873, the Carolina Narrow Gauge Railroad Company was authorized to consolidate with the Chester and Lenoir Narrow Gauge Railroad Company.

By authority of these Acts of the General Assemblies of North Carolina and South Carolina, the Chester and Lenoir Narrow Gauge Railroad Company, and the Carolina Narrow Gauge Railroad Company, were consolidated on the 14th day of May, 1873, under the name of the Chester and Lenoir Narrow Gauge Railroad Company.

On the 23rd day of August, 1873, the defendants, the county commissioners of Caldwell county, met and in pursuance of the act of the General Assembly, chap. 191, laws of 1868–'69, and a majority of all the members of the Board being present, caused to be spread upon their record the following resolution, to-wit:

*Resolved 1st.* That in order to secure to the people of said county the benefit to be derived from the building and operation of a Railroad within the county, the County Commissioners aforesaid in their official capacity do hereby subscribe, subject to the ratification of the qualified voters of said county, at an election hereinafter provided for, for six hundred shares of the capital stock of the Chester and Lenoir Narrow Gauge Railroad Company upon the terms and conditions following:

1st. That this subscription shall be payable in the bonds of said county, at their par value.

2. That the said bonds shall be payable twenty years from the date of their issue with coupons for the interest attached, and shall be of the denomination of one hundred dollars each, bearing interest at the rate of seven per centum per annum, payable annually, on the 1st day of January.

*Resolved* 2nd. That in exchange for certificates of stock in the Chester and Lenoir Narrow Gauge Railroad Narrow Gauge Railroad for like amounts, the County Commissioners aforesaid, shall deliver to the President and Directors of said Railroad Company, the bonds of said county, at the time and in the manner following, viz: Upon the completion of said Railroad Company's Railroad bridge, over the Catawba river, one hundred bonds, amounting to $10,000. Upon the completion of said Railroad, to the town of Marion, five hundred bonds, amounting to $50,000.

*Resolved* 3rd. That it shall be the duty of the County Commissioners aforesaid, to appoint proxies to represent and vote the stock of said county, at all meetings of the Railroad Company, to receive the dividends which may be declared from time to time by said Railroad Company, to apply said dividends to the payment of the interest on the county bonds, and to perform such other duties as may be necessary to protect the interest of the county as a stockholder in said Company.

*Resolved* 4th. That the coupons of said county bonds as they become due, shall be received in payment of all county taxes.

*Resolved* 5th. That a tax sufficient to meet the interest accruing on said county bonds shall be imposed and collected annually as other taxes are.

*Resolved* 6th. That in order to obtain an expression of the will of the people of our said county and to make valid the aforesaid subscription in case of its approval by the qualified voters of said county at the polls, an election shall be held according to law, at the several precincts in said county on the 9th day of October, 1873, at which election, all those who are in favor of the county subscription aforesaid, shall vote upon

written or printed ballots, "subscription," and those opposed to the said subscription shall vote "against subscription."

In pursuance of the above resolution an election was held on the 9th day of October, 1873, after being advertised according to law, at which election 387 votes were polled in favor of said subscription, and 344 against subscription.

It was in evidence that at the Presidential election of 1868, the largest number of votes cast was 1011. At the election for Attorney General in 1870, the greatest number was 949—at the election concerning a convention in 1871, the largest number of votes cast was 1055—at the election for Governor in 1872, the greatest number of votes cast was 1161.

After hearing the case his Honor, gave judgment for the plaintiff. From which judgment the defendant appealed to the Supreme Court. These are the material facts in the case except those set forth in the opinion of the Court.

*Smith & Strong* and *Gaither & Bynum*, for appellant.
*Folk & Armfield* and *Cilley*, contra.

RODMAN, J. Our opinion as to the meaning of sec. 7, of Art. VII, of the State Constitution, relieves us from the necessity of considering any of the other questions which were ably and learnedly discussed by counsel.

That section is in these words:

" SEC. 7. No county, city, town or other municipal corporation, shall contract any debt, pledge its faith, or loan its credit, nor shall any tax be levied or collected, by any officers of the same, except for the necessary expenses therefore, *unless by a vote of a majority of the qualified voters therein.*"

It is contended for the plaintiffs that these words mean, a majority of the qualified voters therein, who *actually vote at the election upon the question.*

1. It is not the natural meaning of the words used, but requires an addition of words to qualify and limit the generality of the expression. If the words used are so ambiguous

as to be unintelligible without some addition, (as were the words prescribing the tenure of a Judge appointed to fill a vacancy, commented on by the Chief Justice, in the case of *Cloud* v. *Wilson*, at this term, such addition must be made as may be found proper on a consideration of the context, and of all other circumstances bearing on it. But to add limiting or qualifying words, is not in general permissible, or except for very strong reasons, when the words used contained an intelligible description of the object. The word "*therein*" is important. It means "*in the county*," and the phrase may then be read as,—"a majority of the qualified voters of the county."

2. To this construction it is objected, that the number of qualified voters cannot be certainly ascertained except by a census, or registration, immediately preceeding an election. The Constitution Art. VI, sec. 2, directs the General Assembly to provide for a registration of voters from time to time; and it has accordingly provided for a registration just before each general election. It must have been such a registration, that was in the view of the framers of the section under discussion as the means of determining the number of qualified voters in a county. It would not be precisely accurate for any period after the election in view of which it was taken, but it would be sufficiently so, for practical purposes.

3. The question to be determined in this case, differs in several material respects from that in *Reiger* v. *Commissioners of Beaufort*, 70 N. C. Rep. 319. The act which gave the defendants in that case, power to contract the debt on the result of an election, evidently assumed that but for each act, they had not the power. It was intended to be an enabling act. The clause in the Constitution which we are now considering, assumes that municipalities might contract, if not prohibit. It is a disabling act, and must be reasonably, (I do not say liberally,) construed to suppress the grievance. What was the grievance? Many counties and towns, as is well known had contracted debts, the interest of which, under the changed circumstances, could only be met by oppressive taxation, and in

consequence of that, the value of immovable property in such places, was reduced. Under the construction contended for by the plaintiffs, the section in question would be an inadequate remedy. In all or most instances of county debts by subscriptions to railroad stocks, they had been submitted to the people of the county, and approved by a majority of those voting. Experience demonstrated that an active few, interested in procuring the subscription, could nearly always succeed in getting a majority of the actual voters. The Constitution meant to put new restrictions on municipalities, to increase the difficulty of their contracting debt, and to give the tax payers additional protection not only against the extravagance or fraud of their municipal representatives, but also against the arts of corporations, and the imprudent generosity of a minority of the voters. It meant to prohibit the contracting of a debt without the affirmative consent of a majority of the people of the county who were qualified to vote.

The case of *Reiger* differs from the present in a particular even more material. In that case the commissioners declared that the requisites of the law had been complied with, and issued the town bonds, which went into the hands of innocent purchasers. In the present case the Commissioners have declared that the proposed subscription received a majority of the votes cast at the election, but they have not declared that the requisites of the Constitution have been complied with, and they have not issued the bonds. No innocent holder is in the case.

The decision in *Reiger's case* is supported by the case of *Webb* v. *Home Bay Commissioners*, Law Reports, 52, B. 642, and by numerous cases cited in Bigelow on Estoppel, 461 to 468. These cases illustrate the just distinction between cases in which a corporation is required to issue bonds *ultra vires*, and where it has issued the bonds which have come into the hands of an innocent purchaser. In the latter class of cases, the corporation is estopped to deny the regularity of the issue. *Rogers* v. *Burlington*, 3 Wall., 654.

4. The Act of 1868–'69, chap. 3, enacts that in all special elections persons theretofore registered as voters should be allowed to vote, and the Judges holding an election are required to register all qualified persons on application. The Act of 1869–'70, chap. 9, amends the above by adding to it a *proviso*, that in all special elections ordered by any county the Judges shall register the names of all persons who vote, and " a majority of all the votes cast, so registered, shall prevail for the purposes of such election."

The counsel for the plaintiffs construe this Act as requiring a new registration of every voter before the special election, and as disqualifying any person from voting at that election who is not so specially registered. Whether this was the intention seems doubtful, but we will assume that it was. We think that the Act is unconstitutional. The Assembly has power, and is required to provide from time to time for the registration of voters, and no person can vote who has not been registered. No doubt the Assembly might require every qualified voter, even if he had been previously registered, to register over again in view of every election. Perhaps, also, it might lawfully require all voters to register over again in view to every election, and might declare that only those so registered should vote at that election. The vice of the Act does not consist in this, but in declaring that a majority of the votes cast shall prevail, thereby ignoring all those qualified voters who did not register in view of the special election, but who, nevertheless, are in the meaning of the Constitution a part of the qualified voters of the county, a majority of whom must vote in favor of a debt before it can be contracted. The Constitution defines who are the qualified voters of a county, (Art. VI, sec. 1,) and the Legislature cannot change the qualifications.

Although no person can vote without registration, yet if he comes within the description contained in the section just cited, he is a qualified voter of the county within the meaning of sec. 7, Art. VII, although he has never registered. Within

the meaning of that section, a qualified voter is one who is entitled to be registered as a voter and who is qualified to vote upon registration.

It is true that the only practicable way of ascertaining the number of qualified voters of a county at any given time, is by a reference to the book of registration of the general election next preceding, so that practically, the number of qualified voters and of voters so registered is the same. But in the idea of the Constitution, the terms qualified voters and registered voters, are not exactly co-extensive. The former is the most extensive. Sec. 1, of Art. VI, defines who are qualified voters. Section 2 disables from voting such qualified voters as fail to register. Non-registration is therefore not a disqualification, but a disability, just as a man may be a qualified voter in every respect, though disabled from voting by reason of sickness which prevents his getting to the polls.

The Act is plainly an attempt to evade the restriction which the Constitution has put on the power of counties to contract debts. It would permit a county debt to be contracted without the consent of a majority of the qualified voters therein.

In our opinion the Judge below erred in ordering the *mandamus*.

Per Curiam. Judgment below reversed, and judgment in this Court for the defendants.