E. L. McCORMAC and others v. COMMISSIONERS OF ROBESON.

*Counties and County Commissioners—School Districts—Legislative Power.*

1. Where the legislature by special statute authorized an election to be held in "school districts number one and two" to obtain the sense of the electors in those districts upon the question of the establishment of a graded school, and an annual assessment for its support, *it was held* that the county commissioners had no power, after the passage of the act, to change the boundary line of the districts, or to consolidate districts number one and three, and designate it "district number one." The election in the district so constituted, and also that held in district number two, were void and the assessments illegal.

2. But the court intimate that the mistake of the commissioners may be remedied by holding an election in the districts as they existed when the act was passed, upon giving reasonable notice—treating the time fixed in the act as merely directory.

3. The power of the legislature to subdivide the state into counties, school districts, &c., either directly or through agencies invested with power for that purpose, discussed by MERRIMON, J.

(*State* v. *Jones*, 1 Ired., 414; *Mills* v. *Williams*, 11 Ired., 558; *Love* v. *Schenck*, 12 Ired., 304; *Taylor* v. *Com'rs*, 2 Jones' Eq., 141; *Manly* v. *Raleigh*, 4 Jones' Eq., 370; *Hill* v. *Com'rs*, 67 N. C., 367; *Com'rs* v. *Com'rs*, 79 N. C., 565; *Watson* v. *Com'rs*, 82 N. C., 17; *Grady* v. *Com'rs*, 74 N. C., 101; *Buckman* v. *Com'rs*, 80 N. C., 121, cited and approved).

Motion for injunction in an action pending in Robeson Superior Court, heard at Chambers in Fayetteville in December, 1883, before *McKoy, J.*

The act "to establish a graded school in Shoe Heel districts number one and two for white children," ratified on the 8th · day of March, 1883, among other things, provides as follows:

Acts 1883, ch. 282:—

*Section* 1. That the board of commissioners of Robeson county shall submit to the qualified voters of Shoe Heel districts known as districts number one and two for white children in said county, on the first Thursday in April, 1883, under such rules and regulations as said board may prescribe, whether an annual assessment shall be levied therein for the support of a graded public school for the white children in said school districts. Each voter shall vote on a written or printed ballot with the words "for school" or "no school," and said election shall be conducted under the same rules as are prescribed by law for the election of members of the general assembly; provided that two ballot-boxes shall be used, and those electors who reside in district number one shall deposit their ballots in one box, and those electors who reside in district number two shall deposit their ballots in the other; and if a majority of the electors of one district shall vote "for school," and not a majority of the electors of both districts combined, then in that event the school shall be established in the district where the said majority of the ballots were cast, and the trustees named in this act who reside in the said school district shall be trustees of said school.

*Section* 6. That J. C. McCaskill (and others named) in school district number one, and J. B. Wilkinson (and others named) in school district number two, be and they are hereby constituted a board of trustees for the graded school for the whites in school districts number one and two, and are incorporated by the name of the Shoe Heel Graded School, and may sue and be sued, have a common seal, purchase and hold real and personal property, not

exceeding ten thousand dollars in value; and shall have power to fill all vacancies occurring in said board; to employ and dismiss teachers and regulate their salaries; to suspend and expel any pupil, and do all such acts as shall be necessary to carry on said graded school. They shall elect one of their number chairman, and one as secretary, and prescribe their duties.

*Section* 8. The board of trustees may admit as pupils in said graded school children who reside without the boundaries of said school district, upon the payment of such rates as shall be fixed by the board.

*Section* 10. Provides that the funds raised for these districts under the general school law shall be used for the benefit of said graded school.

Next before, at the time of, and next after the passage of this act, there were established in the county of Robeson, Shoe Heel districts number one, two and three, each being separate and distinct from the other, as provided by law. After the passage of the act, the county commissioners undertook, by their order, made at the request of citizens of district number three, to consolidate districts one and three, and at the election held under the act, these two districts were treated as district number one, and the registered voters in both districts voted as electors in district number one. A majority of the votes cast in this consolidated district were "for school," as were a majority of the votes in district number one, as constituted before the consolidation. A majority of the votes cast in school district number two were for "no school."

Treating the election held as regular, and there appearing to have been a majority of the votes cast in district number one in favor of the graded school, the county commissioners proceeded to levy the tax as allowed by the statute, for the support of the school, and placed the tax-list in the hands of the sheriff for collection, and the sheriff was about to proceed to collect the same.

The plaintiffs allege in their complaint that they are tax-payers in Shoe Heel school districts number one and three for white children in the county of Robeson; that the county commissioners had no authority to consolidate school districts number one and three, and that their action was therefore null and void ; that as a consequence, the election held under the act was illegal and nugatory ; that the tax laid was therefore unlawful, and the said sheriff had no legal authority to collect the same; and they demanded judgment that an injunction issue restraining the defendants and their agents from collecting the said tax, and from paying to the trustees named in the said act any part of the public school money for the graded school contemplated by the act.

Upon notice and motion the court granted an injunction restraining the defendants, their agents and servants, from collecting any tax levied in and on account of school district number three for white children for a graded school, until the hearing of this action.   From this order the defendants appealed.

*Messrs. J. D. Shaw* and *Frank McNeill,* for plaintiffs.
*Mr. T. A. McNeill,* for defendants.

MERRIMON, J.   That it is within the power and is the province of the legislature to subdivide the territory of the state and invest the inhabitants of such subdivisions with corporate functions, more or less extensive and varied in their character, for the purposes of government, is too well settled to admit of any serious question.   Indeed, it seems to be a fundamental feature of our system of free government, that such a power is inherent in the legislative branch of the government, limited and regulated, as it may be, only by the organic law.   The constitution of the state was formed in view of this and like fundamental principles.   They permeate its provisions, and all statutory enactments should be interpreted in the light of them, when they apply.

It is in the exercise of such power that the legislature alone

can create, directly or indirectly, counties, townships, school districts, road districts, and the like subdivisions, and invest them, and agencies in them, with powers corporate or otherwise in their nature, to effectuate the purposes of the government, whether these be local or general, or both.  Such organizations are intended to be instrumentalities and agencies employed to aid in the administration of the government, and are always under the control of the power that created them, unless the same shall be restricted by some constitutional limitation. Hence, the legislature may, from time to time, in its discretion, abolish them, or enlarge or diminish their boundaries, or increase, modify or abrogate their powers.  It may provide that the agents and officers in them shall be elected by the electors, or it may appoint them directly, or empower some agency to appoint them, unless in cases where the constitution provides otherwise, and charge them with duties specific and mandatory, or general and discretionary in their character.  Such power in the legislature is general and comprehensive, and may be exercised in a great variety of ways to accomplish the ends of the government. *State* v. *Jones*, 1 Ired., 414; *Mills* v. *Williams*, 11 Ired., 558; *Love* v. *Schenck*, 12 Ired., 304; *Taylor* v. *Commissioners*, 2 Jones' Eq., 141; *Manly* v. *Raleigh*, 4 Jones' Eq., 370; *Hill* v. *Commissioners*, 67 N. C., 367; *Com'rs of Currituck* v. *Com'rs of Dare*, 79 N. C., 565; *Watson* v. *Commissioners*, 82 N. C., 17; Cooley Const. Lim., 191-2-3; 1 Dill. Mun. Corp., §10 and note, 381; Cooley on Tax., 110, *et seq.*

It is not essential that such subdivisions of territory shall always be created directly by legislative enactment.  In many cases, certain existing agencies, or agencies to be provided, are required by statute, to establish them, and when established, they become, by the force of law, invested with certain powers and required to discharge prescribed duties

Whenever such agencies are created, whatever their purpose, or the extent or character of their powers, they are the creatures of the legislative will and subject to its control, and such agen-

cies can only exercise such powers as may be conferred upon them and in the way and manner prescribed by law.

The powers conferred upon such political agencies are either express or implied. The express powers are such as are conferred in terms by statute; the implied powers are such as are necessary to carry into effect those expressly conferred, and are therefore presumed to be granted. It may not always be easy to determine the extent of the powers thus conferred, but they are to be construed with reference to the object of their creation, and given such reasonable interpretation as the terms of the statute and the purposes had in view by it will warrant. When particular powers are conferred and specific things are required to be done, and nothing is left to discretion, the power must be strictly observed, at least there must be a substantial compliance with the statutory direction. If there should be a material departure from the directions of the statute, in the exercise of a power not conferred, the act done would be void.

Now applying these principles to the case before us, we are clearly of opinion that the county commissioners exceeded their authority and the election held was void.

By the general school law of this state, THE CODE, §§2545, 2546 and 2549, county commissioners are constituted the board of education for their respective counties, and as such board of education, they are charged with the general management of the public schools in their counties; they are empowered to decide all controversies and questions relating to the boundaries of school districts, and to see that the general school laws are enforced; and it is further made their duty to " lay off their repective counties into convenient school districts, consulting as far as practicable the convenience of the neighborhood. They shall designate the districts by number, as school district number one, school district number two," and so on. Their powers as the county board of education are derived from public school laws, and apply only to such schools; they do not apply to other schools, unless in cases where they may be extended to embrace them by

particular statute; and in such cases they could only exercise the special powers conferred.

It appears that the county commissioners of Robeson county, in their capacity as the county board of education, had, prior to the 8th of March, 1883, laid off their county into convenient school districts, and especially, for the purposes of this case, they had laid off "Shoe Heel school districts known as districts number one and two, for white children;" and also Shoe Heel school district number three.    These districts were established and entirely separate and distinct, each from the other, as the law required and allowed.

The legislature, for causes satisfactory to it, probably upon application of the people, passed the act of 1883, ch. 282, the plain purpose of which is to extend to Shoe Heel school districts, known as number *one and two,* in addition to the advantage of the ordinary public schools, that of a graded school, if the electors of *those districts* should vote at an election to be held for the purpose in favor of levying an annual assessment upon the taxable property and polls in those districts, as prescribed by the act, for the support of such graded school.    The advantage intended to be conferred was special and local, and it involved the exercise of the taxing power for an indefinite period of time in the future.    The school provided for was to be separate and distinct from the ordinary public schools, and outside of the general public school laws, and, therefore, not under the management of the county board of education.    So much of the public school moneys as might be due to those districts was to be paid to the proposed graded school authorities.    This appears upon the face of the act itself.    It provides for a board of trustees, incorporates and confers upon them important corporate powers, giving them the entire supervision and control of the school. There is nothing in the act going to show that the county board of education should have control or management of the school in any respect, when established.    The graded school provided for, and the corporate authority conferred upon its board of trustees, embraced the definite area of the two districts number one

and two, and no power could change this boundary, except the legislature. The act embraced and applied to those boundaries and none others, and neither the board of education nor any other agency was authorized to change them. The effect of the act for the purposes of the graded school, is to put those two districts beyond the control of the county board of education for any purpose, under existing laws.

It is to be presumed there were special and weighty considerations—such as the number of inhabitants, the number of school children, the amount of the taxable property, the convenience of the people, and the like considerations, that prompted the passage of the act. There is nothing in it that indicates a general purpose to extend the benefit of such schools to the people generally; on the contrary, as the general school law of the state provides schools for all classes of people, the inference is that such was not the purpose. Besides, graded schools in many localities in the state, for local considerations, are incorporated by special statute for the purpose. The purpose of the act before us was special and local. Particular agencies invested with defined powers and supplied with appropriate means, were provided to effectuate that purpose. The school districts were established, known, particularly designated, under the law.

It was convenient and appropriate to charge the county commissioners with the particular duty of holding the election to take the voice of the people as to the assessment. They being the county board of commissioners, in the ordinary course of such things, ought to direct, supervise and determine the result of the election. This duty, however, involved no exercise of judgment, except to ascertain the result of the vote; and with this exception it was purely ministerial. They were charged simply to hold the election and determine the result, and the act contemplates, that if the school shall be established, it is not to be under their control, but under the control, supervision and direction of the board of trustees.

There is not the slightest intimation in the terms of the act,

or arising by implication, of a purpose to embrace any school district except the two therein mentioned. There is not the remotest implication arising from any words or provisions in the act, or any general legislative policy of which we have any knowledge, or from the office and duties of the county board of education, of authority in the county commissioners to consolidate the school districts number one and three, for the purposes of the proposed graded school. Indeed, as we have said, the effect of the act is to put the two districts mentioned in it, outside of and beyond their control, while they continued to have the general management of the other public school districts in their county. The act contemplates a permanent school to be kept up indefinitely as to the time of its existence, and by the special agencies and means provided in those districts.

We cannot see the slightest authority in the county board of education for consolidating the districts one and three. They might as well assume to consolidate school districts four and five, or all the school districts in the county, with district number one with a view to give them the benefit of the graded school.

It appears that the people in district number three desired to have the benefit and advantages arising from the graded school. Then, they ought to have asked the legislature to embrace them in the act providing for it. The legislature might or might not have granted their application. It alone could do so. It was not unmindful that pupils outside of districts one and two might desire to attend the school, for it is provided in the act that such pupils may attend, in the discretion of the trustees. This provision tends to show that the legislature advisedly did not intend to embrace any but the two districts mentioned in the act.

We are forced to the conclusion that the county commissioners, in their capacity as the county board of education, misapprehended the extent of their powers, and that they had no authority to consolidate the school districts number one and three, and

29

that their action in that respect was, therfore, void and of no effect.

We think, also, that the election held was illegal and void, because it was not held as directed by the statute. What effect the consolidation of districts number one and three may have had upon the minds of the electors voting, inclining them to vote for the assessment, and upon other electors who did not vote, in keeping them from the election, it is impossible to determine.

It may be, that the mistake of the county commissioners can be remedied by holding an election upon reasonable notice in districts number one and two, as directed by the act, treating the time fixed in the act for holding the election as directory, but that question is not before us, and we are not at liberty to decide it. *Grady* v. *Commissioners*, 74 N. C., 101; *Buckman* v. *Commissioners*, 80 N. C., 121.

The court properly granted the injunction, and there is no error in this respect. Let this be certified.

No error.                                        Affirmed.

IN SAME CASE:

MERRIMON, J. In this case both plaintiffs and defendants appealed to this court. We have decided the material questions presented in the defendants' appeal, *supra*.

The plaintiffs appealed on the ground that the court refused to restrain the defendants from collecting the assessments levied in school district number one. For the reasons stated in the opinion in the defendants' appeal, we held that the election held in Shoe Heel district number one, as consolidated with school district number three, was illegal and void. Most of the reasons assigned in support of that decision apply here. We think the election held was wholly void as to both the districts number one and three, and in number two as well, and therefore the assessments in district number one were improperly levied and cannot be collected.

The plain purpose of the statute, was the establishment of a graded school for white children in Shoe Heel district known as districts number one and two. With that object in view, the act provides that an annual assessment as provided for, should be levied upon the taxable property and polls in those districts, for the support of such school, if a majority of the electors therein should vote at the election directed to be held, "for school," or, in case a majority should vote in one district "for school," and a majority in the other should vote " no school," then the assessment should be made in the district voting " school," as allowed by the act.

Thus it will be seen, that there was a common purpose as to both districts, and the election directed to be held was to materially affect this purpose in both or either, as it might result one way or the other in each. If there should be a majority " for school " in each, then the assessment should be levied in both; if there should be such a majority in but one, then the assessment should only be made in that one. A variety of considerations might readily influence the electors in both districts to vote " for school," or for " no school."

If the population, number of school children, the property subject to assessment, and other considerations, in their extent and variety, should combine to make the contemplated school a useful and successful one, the elector might readily vote " for school"; on the other hand, if these considerations should be such as not to give promise of such results, he might just as readily vote " no school." And so, an elector in either district, might be influenced to vote " for school," if district number three, with its population, school children, taxable property and like favorable considerations, could be brought into and made a part of school district number one.

In another view, an elector might justly have refused to attend the election and vote one way or the other, upon the ground that he believed the election to be illegal. Indeed, it appears, that a very considerable number of the electors did not vote at the

election, for this or some other cause. The purpose of the election was to ascertain the true voice of the electors in both districts upon the question of the annual assessment, in view of the condition and circumstances of those districts, uninfluenced by considerations beyond and outside of them. The view we have taken goes to show that the election as held did not serve that purpose, at all events, it may not have done so, and it was not, therefore, the election contemplated and required to be held by the statute.

The county commissioners misapprehended the extent and nature of their power. It is very clear that they had no authority to consolidate districts number one and three, and, however praiseworthy their motives may have been to extend the benefits of the graded school to district number three, their action was unauthorized and void, and the election held was likewise illegal and inoperative. The object of the statute was such as we have attributed to it. To what extent and in what way the unwarranted action of the commissioners influenced the electors in district number two to vote " for school," and others of them not to vote, as they would have done if the election had been properly held, it is impossible to ascertain.

The election was illegal and void, and hence the assessment levied upon the property and polls in district number one was unauthorized and illegal, and the court below ought to have granted the injunction as prayed for by the plaintiffs, until the final hearing of the action.

Other questions as to the validity of the act were discussed on the argument before us, but the view we have taken and the grounds upon which we base our decision, render it unnecessary to decide them now.

There is error, for which the judgment of the court below must be modified, by granting the injunction as prayed for, restraining the defendants from collecting the assessments levied in district number one, and to that end, let this opinion be certified to the superior court of Robeson county. It is so ordered.

Error.                                                                Reversed.