L. B. WOODALL v. WESTERN WAKE HIGHWAY COMMISSION.

(Filed 6 November, 1918.)

1. **Road Districts—Roads and Highways—Constitutional Law—Elections—Special Registrations—Majority Vote—Statutes.**

    The construction and improvement of public roads are a necessary expense, within the meaning of our Constitution; and for that purpose the Legislature, by the passage of an act meeting the constitutional requirements, as to its passing on the three several days and the recording of the "aye" and "no" vote (Art. II, sec. 14), may pass a valid act to become effective without submitting the question to the vote of the territory prescribed; and an act passed accordingly, requiring only a majority vote under a special registration for a road district as sufficient for the validity of bonds to be issued for the improvement of a public road within the district, is constitutional; and an objection that it should have required a majority of the qualified votes therein is untenable. Constitution, Art. VII, sec. 7.

2. **Road Districts—Cities and Towns—Constitutional Law—Statutes.**

    The Legislature has constitutional authority to change, divide, and subdivide, or abolish the lines of counties, townships, and cities, or to bring them, in whole or in part, within districts it may establish for road purposes; and where an incorporated town lies within a created road district

o

and will receive the benefits of a road to be improved therein, it may not be objected that the road only came to its corporate limits and that therefore the act was unconstitutional in its provisions.

3. **Road Districts—Single Highway—Constitutional Law.**

The Legislature may create a district for the improvement and maintenance of a single road, within its constitutional authority to create road districts, by statute passed in accordance with the constitutional requirements.

4. **Road Districts — Statutes — Constitutional Law—Delegated Authority—Registrars—Poll Holders.**

Where the Legislature has passed a valid statute creating a road district, it may confer authority on the commissioners of an incorporated town therein to appoint the registrars and poll holders of an election to be held therein by the voters within the district.

5. **Road Districts — Statutes — Bonds — Sales—Road Commissioners—Delegated Powers—Constitutional Law.**

Legislative authority given to the commissioners of a special road district created by the act to sell bonds, for the purposes of the roads to be improved and maintained, within their discretion, at a price not less than par, is constitutional and valid.

6. **Constitutional Amendments—Time of Its Effect—Road Districts—Taxation.**

The recent constitutional amendments ratified at the election in November, 1916, did not take effect until after 10 January, 1917, and cannot affect a statute, passed before the latter date, creating a road district and providing for a tax levy and bond issue for road improvement and maintenance.

7. **Elections — Electors—Oath—Qualifications—Registrars—Judge of Elections.**

The mere failure of the registrars to administer the oath to the electors, and allowing them to vote where not challenged, will not affect the result of the election held for the establishment of a special road district under valid legislative authority, when the electors so voting are qualified. Constitution, Art. VI, secs. 1 and 2.

8. **Elections—Irregularities—Statutes, Directory.**

The object of election laws is to afford the qualified voters a fair and full expression of their wills; and where the result has been fairly obtained and without fraud, it will not be defeated by mere irregularities in conducting the election.

9. **Elections—Votes—Presumptions—Illegality—Burden of Proof.**

Where the vote of an elector has been received and deposited by the judges of the election, it is presumed to be a legal vote, with the burden upon the contesting party to show its illegality.

10. **Elections—New Registration—Electors—Qualification—Statutes, Directory.**

Where the statute authorizing an election for the establishment of a special road district requires a new registration for the purpose, and the

vote of an elector is received and deposited, it will not afterwards be held to be illegal if he is otherwise qualified to vote, though he may not have complied with the *minutiæ* of the registration law.

### 11. Elections—Electors—Oath.

It is not the duty of an elector to see that he is duly sworn, and that the registrars and poll holders observe the directory requirements of the statutes addressed to them.

### 12. Electors—Qualification—Evidence—Questions for Jury.

The rulings of the judge and his charge to the jury as to the qualifications of electors voting under the "grandfather clause" of the Constitution (Revisal, sec. 4331), and also of the ability of others to qualify by reading the Constitution, etc., are approved, the question being for the jury, under the evidence in the case.

### 13. Courts—Discretion—Evidence—Appeal and Error.

It is within the discretion of the trial judge to permit plaintiff's witness to testify to new matter after the defendant's evidence is closed, and not reviewable on appeal.

ACTION, tried before *Stacy, J.,* and a jury, at June Term, 1918, of WAKE.

This action was brought by the plaintiffs to enjoin the issuance of $130,000 of bonds, authorized by an election held on 27 February, 1917, pursuant to the provisions of chapter 68 of the Public-Local Laws of 1917, creating the Western Wake Highway District. The act provides that the bonds shall be issued if a majority of those voting at the election approve it. The act was duly passed in accordance with article 2, section 14, of the Constitution.

It was a new registration, and 379 voters were registered at the two precincts of Cary and Method. Of this number 231 voted for bonds and 133 voted against bonds and 15 did not vote. In the complaint and several amendments which were filed thereto the plaintiffs alleged that 104 of those who voted for bonds were disqualified. It appears that none of these voters were challenged on the day of the election or prior to the election.

The defendants, in their answer, alleged that of those who voted against highway improvement, quite a number were disqualified, and the plaintiffs in open court admitted that of those attacked by the defendants seven were disqualified, and deducted these seven from those who voted against bonds, leaving 126 votes cast against bonds.

If we deduct all the 104 voters attacked by the plaintiffs, and voting for bonds, from the total vote cast for bonds, it leaves 127, which is one majority of the votes cast, so that upon the final count it seems that a majority of one voted for bonds. This is set out fully in a part of the judge's charge, to which there is no exception, and under the charge

and the evidence the jury found, in answer to the second issue, that the election was carried by a majority of the qualified voters voting. The plaintiffs say that if this is conceded, the construction of the highway was not a necessary expense, and that, therefore, the bonds could not be legally issued unless they were carried by a majority of the registered, qualified voters.

To meet this contention of the plaintiffs, the court submitted to the jury the third and fourth issues, and the jury found, in answer to the third issue, that the election was carried by a majority of the registered, qualified voters, and in answer to the fourth issue, that this majority was seventeen. Of the 104 voters of the majority who were attacked by the plaintiffs, the defendants admitted that 57 of them were disqualified for various reasons and denied that the balance of 47 were disqualified. During the progress of the trial the defendants admitted that of the 47, the evidence had shown four to be disqualified, to wit: Donnie Crump, Jerry Hogan, Madison McCoy, and H. H. Waddell, leaving 43 voters in controversy which were attacked by the plaintiffs, and the qualifications of these 43 were submitted to the jury to be determined by them.

In addition to the seven who voted against bonds and who were admittedly disqualified, the defendants attacked thirteen others who voted against bonds and four who were registered but did not vote. Of this number the defendants, during the progress of the trial and after the evidence was introduced, admitted that the disqualification of four had not been shown, but the defendants contended that certain others (naming them) were disqualified, all of these voting against bonds except two, who did not vote. The qualifications of these voters who were attacked by the defendants were submitted to the jury to determine under the evidence and charge of the court.

The plaintiffs' brief discusses only the exceptions relating to the qualifications of all of the voters whose right to vote was attacked either by the plaintiffs or the defendants and raised several issues in the case. Of these there were eleven, four of whom voted against the issuing of bonds, and their qualifications were denied by the defendants, and the remaining seven voted for bonds and their votes attacked by the plaintiffs.

As the jury found that the election was carried by a majority of sixteen of the registered, qualified vote, it is apparent that even if the appellants should be right in their contention as to all eleven of said voters, there would still be a majority of such vote in favor of the bonds. It may, therefore, be unnecessary to consider these exceptions, but we will presently refer to them to some extent.

The following are the several grounds upon which the plaintiffs

allege in their complaint and amendments thereto that the act in question and the election held thereunder are invalid:

1. The plaintiffs contend in paragraph 6 of their original complaint that in order for the bonds to be lawfully issued, and the levy of a tax to be authorized, it is necessary that a majority of all the qualified voters of the district should have approved the same.

2. It is next contended by the plaintiffs, in section 9 of their complaint, that the act is invalid for the following reasons:

(a) The Legislature could not create this road district and include the incorporated town of Cary when the road to be improved comes only to the corporate limits of the town.

(b) The Legislature cannot create a road tax district to work only one highway in the district.

(c) The Legislature cannot pass an act creating a special road district and in said act direct that a highway already improved should be further improved.

(d) The Legislature cannot pass an act authorizing the board of commissioners of the town of Cary to appoint judges and pollholders of the election.

(e) The Legislature had no power to pass an act authorizing the levy of taxes and the issuance of bonds by a special tax district upon the vote of a majority of those actually voting at the election called thereunder.

3. In paragraph 11 of the original complaint it is alleged that the act is invalid for the reason that no provision is made for advertising the sale of the bonds and calling for bids and for selling the bonds to the highest bidder, but that the highway commissioners are given power and authority to negotiate and sell the bonds at such price, at or above par, as they, in their discretion, may deem best.

4. In the amendment to the complaint, which was filed on 3 April, it is alleged that the act is invalid because the constitutional amendments, which were adopted at the election of 1916, took effect in November of that year.

5. In the amendment to the complaint filed before the referee on 14 April it is alleged that the names of many persons were improperly placed upon the registration books of the road district because the registrars did not administer the oath to them and did not see some of the persons, but the names of the latter were handed by others to the registrars, who then entered the names on the registration books.

The following verdict was returned by the jury:

1. Was the act creating the Western Wake County Highway District passed in accordance with article 2, section 14, of the Constitution? Answer: "Yes." (Answered by consent.)

2. Was a majority of the qualified votes cast in the special election held on 27 February, 1917, "For Highway Improvement"? Answer: "Yes."

3. Did a majority of the registered, qualified voters resident in said Western Wake County Highway District vote "For Highway Improvement" in the special election held on 27 February, 1917? Answer: "Yes."

4. If so, by what majority of the registered qualified vote was said election carried? Answer: "Sixteen."

5. Was the election in said district conducted by the officials with such utter disregard of the requirements of law as to render same null and void? Answer: "No."

Judgment upon the verdict, and plaintiffs appealed.

*Manning & Kitchin for plaintiffs.*
*J. Crawford Biggs, R. N. Simms, A. Jones & Son, Douglass & Douglass, Templeton & Templeton, Jones & Bailey, and W. R. Winston for defendants.*

WALKER, J., after stating the case: We will now discuss the exceptions urged by the plaintiffs to the validity of the act and the election in the order we have stated them.

First. Is it necessary that the issuance of the bonds in question should be approved by a majority of all the qualified voters in the district?

The act under consideration provides that the bonds shall not be issued unless a majority of those in the district who are qualified and vote at the election shall decide in favor of them. The answer to this question depends upon whether the improvement of the public roads of a special road district in a county is a necessary expense, for if it is, the Constitution does not require that the question should be submitted to the voters of the district at all, but the Legislature, in creating a special road district, may provide that the bonds shall be issued (1) without a vote of the people (2) only after a majority of those voting have voted for the issuance of the bonds, or (3) only after a majority of all the qualified voters of the district have voted for the bonds; and in either contingency the bonds are valid obligations of the district, provided the statute creating the road district has been enacted by the Legislature in accordance with article 2, section 14, of the Constitution, which provides that a taxing bill shall be passed on three several days and the ayes and noes be recorded in the journal of each house upon the second and third readings, which is not denied in this case.

It is settled by many decisions of this Court that the construction and improvement of public roads are necessary expenses within the

meaning of the Constitution, and that the creation of a debt by the issuance of bonds for that purpose is not required to be submitted to a vote of the people under provisions of article 7, section 7, of the Constitution, and not unless so ordered by the Legislature.

One of the latest cases on this question is *Hargrave v. Comrs.*, 168 N. C., 626, where it was held that "the building of bridges and construction of public roads are necessary expenses of the county." *Comrs. v. Comrs.*, 165 N. C., 632. And it has so been repeatedly held by this Court. *Pritchard v. Comrs.*, 159 N. C., 636, and *Board of Trustees v. Webb*, 155 N. C., at p. 388, where the Court said: "It is well established with us that the construction and maintenance of public roads is a governmental purpose, and the cost thereof is a necessary expense to be paid for by current taxation or by issuing bonds, having regard always to the requirements and limitations of the legislation under which these local authorities are acting for such purpose, and unless the statute so requires, no election by the people is necessary." It appears in that case that the Legislature created a body corporate by the names of the Board of Road Trustees of Youngsville Township and authorized it to issue bonds of the township for working roads therein, without a vote of the people, and we held that the bonds issued were valid and binding obligations of the road district.

In *Hargrave v. Comrs., supra,* the Court said: "The construction and maintenance of public roads are a necessary expense, and the Legislature may provide for the same, and may create a board to do this distinct from the county commissioners, and fix and authorize the levying of taxes for that purpose, as is done in this act, without a vote of the people. We know of no reason to question the correctness of our former decisions."

We cannot, therefore, under the authorities, endorse as correct, or even look with favor upon, the contention of plaintiffs, that taxes cannot be levied or bonds be issued unless a majority of the qualified voters of the district should approve the same. The argument is clear and convincing from the provisions of the Constitution, as its premise, and leads us inevitably to the conclusion that the Legislature may authorize road bonds and a tax in a special district, and with or without a vote of the people. If with a vote, it may say how that vote shall be taken. This obviously follows from the possession of the general power to prescribe the rule of action.

Second. It is contended that the Legislature could not create this road district and include the incorporated town of Cary when the road to be improved only comes to its corporate limits.

We think that this contention is without merit. All of the town of Cary is within the road district, and gets the benefit of the road; but

we understand the contention is that, because Cary is an incorporated town, the property in it is immune from taxation for this road purpose. Is this so? The Constitution recognizes the existence of counties, townships, cities and towns as governmental agencies (*White v. Comrs.,* 90 N. C., 437), but they are all legislative creations and subject to be changed (*Daro v. Currituck,* 95 N. C., 189; *Harris v. Wright,* 121 N. C., 178), even abolished (*Mills v. Williams,* 33 N. C., 558), or divided and subdivided (*McCormac v. Comrs.,* 90 N. C., 441) at the will of the General Assembly, as we held in *Jones v. Comrs.,* 143 N. C., 59, and *Board of Trustees v. Webb,* 155 N. C., 379.

In *Board of Trustees v. Webb, supra,* the Court further says: "In *Smith v. School Trustees,* 141 N. C., 143, the Legislature incorporated a school district, confined territorily to portions of two existent townships, authorized the trustees of the district to issue bonds, levy and collect taxes, etc., and the court, after full and careful consideration, held that this power of the Legislature over counties, townships, etc., when acting as governmental agencies, was not confined to the ordinary political subdivisions of the State, but that it authorized and extended to creating special public *quasi* corporations for governmental purposes in designated portions of the State's territory, and that in the exercise of such power county and township lines could both be disregarded if such action was, in the judgment and expressed declaration of the Legislature, best promotive of the public welfare. And within the proper exercise of this power were included levee, school, drainage, road and highway and other special taxing districts."

In *McCormac v. Comrs.,* 90 N. C., 441, quoted with approval in *Board of Trustees v. Webb, supra, Merrimon, J.,* said: "That it is within the power and is the province of the Legislature to subdivide the territory of the State and invest the inhabitants of such subdivisions with the corporate functions, more or less extensive and varied in their character, for the purpose of government, is too well settled to admit of any serious question. Indeed, it seems to be a fundamental feature of our system of free government that such a power is inherent in the legislative branch of the government, limited and regulated, as it may be only by the organic law. The Constitution of the State was formed in view of this and like fundamental principles. They permeate its provisions, and all statutory enactments should be interpreted in the light of them when they apply. It is in the exercise of such power that the Legislature alone can create, directly or indirectly, counties, townships, school districts, road districts, and like subdivisions, and invest them, and agencies in them, with powers, corporate or otherwise in their nature, to effectuate the purposes of the government, whether these be local or general, or both. Such organizations are intended to

be instrumentalities and agencies employed to aid in the administration of the government, and are always under the control of the power that created them unless the same shall be restricted by some constitutional limitations." But this point has been squarely decided by us in *McLeod v. Comrs.*, 148 N. C., 77, at p. 85, where the Court says: "It is clear to us that the Legislature intended to establish a school district within the corporate limits of the town of Carthage and from a part of the territory of the said town for the purposes specified in the act, and that bonds should be issued, not by the town, but by the corporate authorities of the town, the board of commissioners, for and in behalf of the school district so created by the statute. It was perhaps considered more convenient and less expensive to have the board of commissioners, the treasurer, and the tax collector of the town perform the several duties and functions assigned to them than to provide for the appointment or election of officers within the school district for that purpose. We can see no objection to this method of administering the affairs of the district and to the procedure adopted in order to execute the purpose the Legislature had in view," citing *Smith v. School Trustees, supra.*

The case of *Jones v. Comrs.*, 137 N. C., 579, construes the powers of the Legislature over counties and municipalities to be very broad and far-reaching, giving to it practically full control of them.

Third. It is further claimed that the Legislature did not have the power to create a road tax district to work only one highway.

This was a matter in the discretion of the Legislature. It would be conceded, we suppose, that the Legislature could create a special road district and appoint the commissioners therefor, and authorize them to spend the money on the roads of the district in such manner as in their judgment is best for the district, and, under this power, the commissioners appointed could spend all the money on one road if they thought best. If they acted arbitrarily or corruptly, a different question might arise as to the remedy for a correction of their bad conduct, but there is no such question here.

In *Comrs. v. Comrs.*, 165 N. C., 632, the Court states that "the *routes* for the roads and their character are expressed in the act." If the contention of plaintiffs is that the Legislature could not authorize "a highway already improved to be further improved," then good roads would cease to be built because practically all the old highways have already been improved, more or less, and the improvement of the roads system would be confined to such new roads as are hereafter opened, or to the very few of the unimproved roads of the State. The truth is, that all of these matters are left to the sound judgment and discretion of the

local authorities, and they should be for very good reasons. *Hightower v. Raleigh,* 150 N. C., 569.

We could not give a better answer to several of the questions now under consideration than by quoting at some length the very practical and sensible views of the Court in *Brodnax v. Groom,* 64 N. C., 244, as stated by *Chief Justice Pearson.* That case, it will be remembered, was decided just after the adoption of the Constitution of 1868, which contained the same provision as the present one regarding taxation and the making of municipal contracts. It was there first stated that the Constitution, art. 7, sec. 7, provides: "No county, city, etc., shall contract any debts, pledge its faith, or lend its credit, nor shall any tax be levied or collected by any officers of the same, *except for the necessary expenses thereof,* unless by a vote of a majority of the qualified voters therein." The Court then proceeds to say: "In regard to contracting debts, pledging its faith, or lending its credit, there is an absolute prohibition, and this section is cumulative and adds another restraint to that of section 7, article 5, which we have been considering. When the prohibition is absolute, so as to take away the power, the courts can handle the subject; but the power to tax is assumed, and an attempt is made to restrain its exercise, 'except for the necessary expenses of the county.' Who is to decide what are the necessary expenses of a county? The county commissioners, to whom are confined the trust of regulating all county matters. 'Repairing and building bridges' is a part of the necessary expenses of a county, as much so as keeping the roads in order, or making new roads; so the case before us is within the power of the county commissioners. How can this Court undertake to control its exercise? Can we say such a bridge does not need repairs; or that in building a new bridge near the site of an old bridge it should be erected as heretofore, upon posts, so as to be cheap, but warranted to last for some years; or that it is better policy to locate it a mile or so above, where the banks ·are good abutments, and to have stone pillars, at a heavier outlay at the start, but such as will insure permanence and be cheaper in the long run? In short, this Court is not capable of controlling the exercise of power on the part of the General Assembly, or of the county authorities, and it cannot assume to do so without putting itself in antagonism as well to the General Assembly as to the county authorities and erecting a despotism of five men, which is opposed to the fundamental principles of our government and the usages of all times past. For the exercise of powers conferred by the Constitution, the people must rely upon the honesty of the members of the General Assembly and of the persons elected to fill places of trust in the several counties. This Court has no power, and is not capable if it had the power, of controlling the exercise of power conferred by the Constitu-

tion upon the legislative department of the government, or upon the county authorities." That case has since been frequently approved by this Court.

Fourth. The contention that the Legislature could not authorize the commissioners of the town of Cary to appoint the registrars and poll-holders for the election is also untenable.

We do not recall any provision of our organic law which places any such restriction upon the power of the Legislature as is asserted in this contention, or rather involved in it. Granted the general power of the Legislature to act in the premises, and to provide for the formation of a special road district and, further, for the construction of a road from Raleigh to Cary, about seven miles in length, which power, we are of the opinion must be admitted, we do not see why the appointment of registrars and poll-holders, instead of being made by the Legislature directly, which is unusual, at least in practice, should not be committed to a local board previously constituted, as was that of the commissioners of Cary, by legislative sanction. Could not the Legislature itself have appointed these officers; and why not delegate this part of its soverign power, as it undoubtedly has legally done in other like cases, to a local board presumed to be fully capable and competent to exercise it? It has appointed other local boards for the same purpose in general elections, such as the State and county boards of elections. The town of Cary is a part of the road district, and if the Legislature could itself have appointed the individuals composing its board of commissioners for the designated purpose, why could it not appoint them because they were commissioners, and, therefore, presumed to be well qualified by their former public service to make and control the appointments of registrars and poll-holders. The fact that the individuals were members of the board was merely incidental, and not material, as the Legislature could have designated them as individuals to act together in making the appointment, without regard to their official character as members of the board of commissioners of the town. They were certainly none the less efficient because they held these offices.

Fifth. We have already considered this contention as to the power of the Legislature to prescribe that a majority of those qualified and voting for the measure shall be sufficient to put it in force.

Sixth. The Legislature undoubtedly had the power to provide how the bonds, if issued, should be sold or disposed of. This was a matter of detail, and it was well within the authority of the Legislature to leave this matter with the highway commissioners of the district by the provision "that they shall have the power to negotiate and sell the bonds at such price at or above par as they, in their discretion, may deem best." This also is a mere matter of administrative procedure which,

under *Brodnax v. Groom, supra,* may be left to the judgment of the local board.

Seventh. The amendments to the Constitution ratified at the election in November, 1916, do not affect this case, as we have decided that they took effect on 10 January, 1917, after this statute was passed (*Reade v. City of Durham,* 173 N. C., 668), even if the amendments themselves, if applicable, would change the result.

Eighth. It is contended by plaintiffs that the votes of electors otherwise qualified should be rejected because the registrars failed to administer the oath to them, and they were allowed to vote without being challenged.

This is answered by the Court in *Quinn v. Lattimore,* 120 N. C., at p. 430, where it is said: "Article 6, section 1, prescribes the qualifications of an elector, and section 2 of this article is a disabling clause (*R. R. v. Comrs.,* 72 N. C., 486; *Norment v. Charlotte,* 85 N. C., 387) placed in the hands of the registrars for their guidance in performing the duties of their respective offices. A qualified elector cannot be deprived of his right to vote and the theory of our government, that the majority shall govern, be destroyed by either this willful or negligent acts of the registrar, a sworn officer of the law. This would be self-destruction—government suicide."

It is said in McCrary on Elections (3d Ed.), at sec. p. 143, sec. 216: "In the courts of the country the ruling has been uniform, and the validity of the acts of officers of election, who are such *de facto* only, so far as they affect third persons and the public, is nowhere questioned. The doctrine that whole communities of electors may be disfranchised for the time being and a minority candidate forced into an office because one or more of the judges of election have not been duly sworn, or were not duly chosen, or do not possess all the qualifications requisite for the office, finds no support in the decisions of our judicial tribunals. We here refer to some of the leading cases." And at section 197 it is further said: "In determining this and similar questions, in cases of contested elections, it should be kept constantly in mind that the ultimate purpose of the proceeding is to ascertain and give expression to the will of the majority, as expressed through the ballot box and according to law. Rules should be adopted and construed to this end, and to this end only." See, also, sections 201 and 204.

In *DeLoatch v. Rogers,* 86 N. C., 357, at p. 360, it is said by the *Chief Justice:* "It is a well-settled rule in contested elections, scarcely needing a reference to authority for its support, that the result will not be disturbed, nor one in possession of an office removed, because of illegal votes received or legal votes refused, unless the number be such that the correction shows the contesting party entitled thereto. If the

obnoxious ballots ought to have been counted for the relator, and yet are insufficient to overcome the majority ascertained by the count actually made, the election will stand and the occupant of the place left in unmolested possession of it."

Irregularities are alleged in the conduct of the registrars and pollholders, and it is shown that many were registered and voted who were not entitled to this right. There were some of these who voted for bonds, and others, but not so large a number, who voted the other way. It would be useless to enter into lengthy details or to comment specially on the numerous complaints in regard to these irregularities. A few general principles settled by our decisions will suffice to cover the entire ground.

Concerning this kind of legislation, it may be said that the object of the law—a fair and full expression of the will of the qualified voters—must be kept in mind. And if this has been obtained, and no fraud appears, this Court does not look for mere irregularities to defeat this will. *R. R. v. Comrs.*, 116 N. C., 563; *McDonald v. Morrow*, 119 N. C., 666; *Harkins v. Cathey*, 119 N. C., 649. But what may be a good reason for not allowing a party to register is not always a good reason for rejecting his vote after it has been cast. A vote received and deposited by the judges' of the election is presumed to be a legal vote, although the voter may not actually have complied entirely with the requirements of the registration law; and it then devolves upon the party contesting to show that it was an illegal vote, and this cannot be shown by proving merely that the registration law had not been complied with. Pain on Elections, sec. 360. A party offering to vote without a regular registration, under some circumstances, may be refused this right by the judges for not complying with the registration law, but if the party is allowed to vote and his vote is received and deposited it will not afterwards be held to be illegal, if he is otherwise qualified to vote. Pain on Elections, sec. 361. We need not say what the rule would be if a majority of registered voters is required. Where a voter has registered, but the registration books show that he had not complied with all the minutiæ of the registration law, his vote will not be rejected. Such legislation is not to be regarded as hostile to the free exercise of the right of franchise, and should receive such construction by the courts as will be conclusive as to a full and fair expression of the will of the qualified voters. Pain on Elections, *supra; Quinn v. Lattimore*, 120 N. C., 426. The case of *Quinn v. Lattimore, supra,* considers these questions quite fully and answers conclusively many of the objections herein made.

In *DeBerry v. Nicholson*, 102 N. C., 465, it is said: "Statutes prescribing rules for conducting popular elections are designed chiefly for

the purpose of affording an opportunity for the free and fair exercise of the right to vote. Such rules are directory, not jurisdictional or imperative. Only the forms which affect the merits are essential to the validity of an election or the registration of an elector. An irregularity in the conduct of an election which does not deprive a voter of his rights, or admit a disqualified person to vote, which casts no uncertainty on the result, and which was not caused by the agency of one seeking to derive a benefit from the result of the election, will be overlooked when the only question is which vote was the greatest. The same principles are applicable to the rules regulating the registration of electors. The vote given at a polling place must not be rejected because of a disregard of those directions contained in the Constitution or statutes (except as to the time and place of holding the election), the nonobservance of which amount to mere irregularity. The same principle governs the registration of electors. The registration of an elector who is qualified to vote must be accepted as the act of a public officer and entitles the elector to cast his vote." And again, in the same case: "But it ought to appear, to warrant this, that none of those voting were regularly and properly sworn; for it is no reason to deprive a qualified voter of his vote that another has been registered who ought not to have been and has no right to vote. In such case the list should undergo expurgation, and those of the latter class (not qualified) stricken from the number given to the candidate for whom, when ascertained, the illegal votes were cast, for it is equally the right of the candidate receiving lawful votes to have them counted as for the opposing candidate to have those that are not lawful rejected from the count."

It is said in 15 Cyc., pp. 372, 373: "Where an election appears to have been fairly and honestly conducted it will not be invalidated by mere irregularities which are not shown to have affected the result, for, in the absence of fraud, the courts are disposed to give effect to elections when possible. And it has been held that gross irregularities not amounting to fraud do not vitiate an election. . . . But the power to throw out an entire division is one which ought to be exercised with the greatest care and only under circumstances which demonstrates beyond all reasonable doubt that the disregard of the law has been so fundamental or so persistent and continuous that it is impossible to distinguish what votes are lawful and what are unlawful, or to arrive at any certain result whatever, or where the great body of the voters have been prevented by violence, intimidation, and threats from exercising their franchise."

The case of *Gibson v. Comrs.,* 163 N. C., 510, approves the case of *Quinn v. Lattimore, supra,* and holds that it is the duty of the registrar to administer the oath to the electors before registration, but that his

failure to perform this duty will not deprive the elector of his right to vote, and that where the registrar has failed to administer the oath to any one of the electors voting in an election the election will not be held invalid on that account. It cannot be successfully contended that it is the duty of the voter to see that he is duly sworn, and that other directory requirements are properly observed, for this Court has said more than once that these provisions of the statute are addressed to the registrars and poll-holders.

Again referring to *Quinn v. Lattimore, supra,* the Court there says: "This provision of the Constitution that no one shall be entitled to register without taking an oath to support the Constitution of the State and of the United States is *directed to the registrars.* It must be to them, and to them alone, as is said by this Court in *Southerland v. Goldsboro,* 96 N. C., 49." And this is repeated in *Gibson v. Comrs., supra,* where it was held: "The fact that the registrar of elections did not administer an oath to any of the electors whose names were registered in the register book would not invalidate an election to determine whether a school tax should be levied, in absence of fraud or improper motive."

The same was stated by the Court of a sister State in *Rowl v. Mc-Cown,* 97 S. C., 1 (81 S. E., 958), where it was held: "The entire registration of electors will not be held invalid because the registration officers failed to apply the tests of qualification prescribed by the Constitution and statutes, and to administer the prescribed oath to those applying for registration."

We have considered nearly all the questions, and quite all that are material, in *Hill v. Skinner,* 169 N. C., 405, and *Hardee v. Henderson,* 170 N. C., 572. We then held, relying principally upon *Wood v. Oxford,* 97 N. C., 227, and *Riggsbee v. Durham,* 99 N. C., 341, as follows: "There is no presumption against the validity of an election; the presumption, if any at all, is the other way. The formal and official declaration of the result is *prima facie* evidence of its correctness, and the burden is upon him who asserts the contrary; and the crucial question is, What was the true result, and did a majority of the qualified voters of the town (Durham and Oxford) vote for the schools in the one case or the issue of bonds in the other? And if this were the case, the alleged irregularity would not defeat or avoid the election.

This Court said in *Quinn v. Lattimore,* 120 N. C., 432: "The object of the law—a fair and full expression of the will of the qualified voters— must be kept in mind; and if this has been obtained, and no fraud appears, we will not look for more irregularities to defeat their will." And in *Hampton v. Waldrop,* 104 N. C., 453, where there was an irregularity in the conduct of the registration, it was held that it would not

vitiate the election if everything was fairly done and a fair opportunity to vote given, and no one voted whose name did not appear on the registration book, or who was not entitled to vote, and no one who was entitled to vote was excluded." Those cases go fully into the law of this subject, and we refer to them without much further comment.

McCrary on Elections, sec. 190, says: "For the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statutes must so hold, whether the particular act in question goes to the merits or affects the result of the election or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the Legislature. See, also, *Briggs v. Raleigh,* 166 N. C., 149, where *Justice Brown,* in a clear discussion of these questions, says, after referring to *Deberry v. Nicholson, supra:* "Statutes prescribing rules for conducting popular elections are designed chiefly for the purpose of affording an opportunity for the free and fair exercise of the right to vote. Such rules are directory, not jurisdictional or imperative. Only the forms which affect the merits are essential to the validity of an election or the registration of an elector," and adds these significant words: "An irregularity in the conduct of an election which does not deprive a voter of his rights or admit a disqualified person to vote, which casts no uncertainty on the result, and which was not caused by the agency of one seeking to derive a benefit from the result of the election will be overlooked when the only question is which vote was greatest. The same principles are applicable to the rules regulating the registration of electors," and then quotes with approval McCrary on Elections, sec. 190, as follows: "If, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory if they do, and directory if they do not, affect the merits of the election."

We approve the rulings of the judge. as to those voters who were challenged by the plaintiffs because of failure to pay. their poll tax; as to Peter Cain, who was placed on the permanent registration roll under the Constitution and Revisal, sec. 4331; as to C. E. Hicks and L. O. Wood and P. S. White and the others specified by the plaintiff's exceptions. There was some evidence to support the charge of the court as to these parties, and it resolves itself virtually into a question of fact as to their qualification or disqualification.

The jury found that there was a majority of those who were qualified and voted in favor of the road scheme, and even a majority of the registered voters otherwise qualified, if that was required. (See *Wood v.*

*Oxford,* 97 N. C., 228.) These are the essential findings to authorize the issue of bonds for the purpose specified in the statute.

But we have had more difficulty in approving the ruling of the court upon the right of the plaintiffs to ask the question of Mortell Jones, their witness, on examination of him in rebuttal of defendant's evidence. The question was whether he could read and write. This disqualification was not alleged in plaintiffs' bill of particulars, it being charged that he was bribed to vote as he did. The court sustained defendants' objection to the question upon the ground that the witness was offered in rebuttal, after the plaintiffs had rested, and the defendants had done the same, and because this disqualification was not specifically mentioned in the pleadings or list of voters alleged to be disqualified. The proposed testimony of this witness was offered in rebuttal, but was not confined to that purpose, as it contained entirely new matter which was not strictly or even substantially in reply to defendants' testimony. McKelveyon Evidence (2d Ed.), at pp. 387, 388, thus states the ordinary method regarding the examination of witnesses: "The successful and orderly administration of justice requires that some system be followed in the introduction of testimony upon a trial, and a uniform system has grown up, a system which has satisfied the English and American idea of fair play. It is, in brief, that each party shall have his say— *i. e.,* put forward his case by his witnesses—and shall complete it without interruption except by cross-examination. The trial thus proceeds by stages until the issues are exhausted. The plaintiff usually begins and must put in his whole case; that is, all the testimony which he intends to offer to support the claims he has made. The defendant then proceeds to put in all the testimony which he has to disprove the facts as shown by plaintiff's witnesses, and if there is an affirmative defense, to support the facts set up in his pleadings. The plaintiff then again takes up the work and is permitted to put in what testimony he has to explain, qualify, or contradict any matter in the defendant's testimony; but he cannot add to his original case. The parties may thus proceed by alternate stages as long as the court, in its discretion, deems anything will be gained in the clarifying of the issues. As a practical matter, the case is usually confined to three or, where there is an affirmative defense or counterclaim, four stages. The regular order of proof may be, and frequently is, departed from by the court. In particular cases the circumstances may prevent the production of a witness by the plaintiff at the proper time, and he may be allowed to examine him after the defendant has put in the whole or part of his case. The court is not bound to allow any departure from the ordinary methods of proceeding. It is simply a matter of discretion, and therefore not a ground for assignment of error." And virtually the same rule is adopted in

*Dupree v. Ins. Co.,* 93 N. C., 237, and in *S. v. Lemon,* 92 N. C., 791, where *Justice Merrimon* says: "When the defendant closed the introduction of evidence on his part, then the State had only the right to introduce rebutting evidence and evidence strictly to strengthen and support that offered at first to prove the allegations in the indictment. After this no further evidence could be introduced on either side of the action except in the discretion of the court. In case any injustice was likely to result from any inadvertence, mistake or misapprehension on either side, the court might—in some cases ought to—allow further evidence to be introduced, being very careful to give neither side undue advantage over the other. That indicated above is the orderly course of trial; any other would protract it indefinitely and lead to interminable confusion. If, however, the court should allow a material departure from the rule on either side, the opposing party would have the right to introduce further pertinent evidence in corresponding degree."

Applying this well-settled rule of practice to this case, we find that while the judge might well have permitted the plaintiffs, in a case of this kind, where public interests are involved, to examine the witness, as they proposed to do, he had the discretion to refuse this privilege, and it was exercised, and is not reviewable by us, as we cannot say that it was abused. The plaintiffs were allowed considerable latitude in amendments and otherwise, and they cannot well complain that in this particular instance the judge ruled adversely to them. He did it, no doubt, because he thought that the examination was being needlessly protracted. If we did not agree with the learned judge in this respect, nor in the other one, that the rule should not have been so strictly enforced when public interests are involved, it would be no reason, in law, why we should reverse, as he was acting strictly in the exercise of his discretion, and there was no abuse of it.

It may be, as suggested, that the testimony of the witness was of such a character that it would not have taken the other party by surprise, or put it at a disadvantage, but the rule was adopted not merely to avoid any such result, but also for the reason that as the party who offers the witness has once had a fair opportunity to elicit the evidence he desires to put before the jury he will not be allowed to do so in rebuttal, except in the sound discretion of the court, which will be exercised according to the particular circumstances. If it had been made to appear that the fact proposed to be proved had just come to the knowledge of the plaintiffs, the judge perhaps would have been more favorable to them; but these matters we have to leave with the judge under all of our precedents. We may clearly see the importance of this testimony if the witness would have given a negative answer, but as the ruling is not reviewable by us we can grant no relief, and, therefore, it

is not necessary to further consider it, except to say that it does not appear what answer the witness would have given if he had been permitted to testify.

Our conclusion, after a careful review of the record, was that there is no error in the trial of the cause.

No error.